**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

CITY OF ATLANTA GENERAL EMPLOYEES' PENSION PLAN, et al,

Plaintiffs,

v.

HELEN OF TROY LIMITED, NOEL GEOFFROY, and BRIAN GRASS,

Defendants.

Case No. 3:26-cv-01528-KC

CLASS ACTION

The Honorable Kathleen Cardone

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 2

II. JURISDICTION AND VENUE ........ 7

III. PARTIES ........ 7

A. Lead Plaintiffs ........ 7

B. Defendants ........ 8

IV. SUMMARY OF THE FRAUD ........ 9

A. Helen of Troy's "Roll-Up" Business Model and Brand Portfolio ........ 9

B. Defendants Misled the Market That They Were Embarking on a Comprehensive Revitalization Centered on Restructuring and Reinvestment ........ 10

C. Throughout 2024 and the First Half of 2025, Defendants Falsely Assure Investors That Helen of Troy is Prioritizing Innovation and Employing Its Consumer-Focused Strategy in Brands With Highest Potential Return on Investment (ROI) ........ 19

1. January 8, 2024 — Q3 FY2024 Earnings Call ........ 19

2. April 24, 2024 — Q4 FY2024 Earnings Call ........ 20

3. July 9, 2024 — Q1 FY2025 Earnings Call ........ 23

4. August 21, 2024 — Annual General Meeting ........ 25

5. October 9, 2024 — Q2 FY2025 Earnings Call ........ 26

6. January 8, 2025 — Q3 FY2025 Earnings Call ........ 26

7. January 13, 2025 — ICR Conference ........ 27

8. April 24, 2025 — Q4 FY2025 Earnings Call ........ 28

D. July 10, 2025: Defendants Reveal a $414.4 Million Impairment on the Invest to Grow Brands, including Hydro Flask, Drybar, Osprey, and Curlsmith ........ 31

E. October 9, 2025: Defendants Reveal the Full Scale of Its Losses, Reporting Its Cumulative Impairments Have Reached $740.8 Million, with Hydro

Flask Goodwill Written to Zero, and the New CEO Admits "Strategies and Execution Have Fallen Short" ... 32

F. Unknown To Investors, Helen of Troy Lets Its Brands Languish As Defendants Slashed Budgets, Stymied Innovation, and Relationships With Critical Retailers Deteriorated ... 35

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 44

A. False and Misleading Statements On October 17, 2023 ... 44

B. False and Misleading Statements On January 8, 2024 ... 45

C. False and Misleading Statements On April 24, 2024 ... 47

D. False and Misleading Statements On July 9, 2024 ... 49

E. False and Misleading Statement On August 21, 2024 ... 50

F. False and Misleading Statement On October 9, 2024 ... 52

G. False and Misleading Statements On January 8, 2025 ... 53

H. False and Misleading Statement On January 13, 2025 ... 54

I. False and Misleading Statement On April 24, 2025 ... 55

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ... 57

A. Defendants Held Themselves Out as Knowledgeable of the Facts Underlying the Fraud ... 57

B. Geoffroy Touted Her Personal Involvement and Oversight of Project Pegasus and Elevate for Growth ... 58

C. Defendants Had Personal Knowledge Contradicting Their Public Statements ... 60

D. Defendants Knew That Analysts Focused on Their Public Statements ... 63

E. Defendants Knew the Events Underlying the Fraud Were Critical for Helen of Troy ... 65

F. Defendants Were Motivated to Prop up Helen of Troy's Stock Price to Avoid Large Impairments ... 67

G. Defendants Were Personally Motivated By Performance-Based Compensation Tied to the Metrics Inflated By the Fraud ... 68

H. Geoffroy Personally Caused a Shift Towards Cost-Cutting and Away From Brand Fundamentals and Product Innovation ........ 70

I. The Timing of Executive Departures Further Supports Scienter ........ 70

J. Admissions From Grass and New CEO Uzzell Further Support an Inference of Scienter ........ 71

VII. THE RELEVANT TRUTH EMERGES: ALLEGATIONS OF LOSS CAUSATION ........ 73

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........ 80

IX. PRESUMPTION OF RELIANCE ........ 82

X. CLASS ACTION ALLEGATIONS ........ 83

COUNT I ........ 85

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder (Against All Defendants) ........ 85

COUNT II ........ 87

For Violations of Section 20(a) of the Exchange Act (Against Defendants Geoffroy and Grass) ........ 87

XI. PRAYER FOR RELIEF ........ 88

XII. JURY DEMAND ........ 89

Lead Plaintiffs City of Atlanta General Employees' Pension Plan, City of Atlanta Police Officers' Pension Plan, City of Atlanta Firefighters' Pension Plan, Metropolitan Transportation Authority Master Trust, and Manhattan and Bronx Surface Transit Operating Authority Pension Plan Trust ("Lead Plaintiffs"), by and through their counsel, bring this action under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Helen of Troy Limited ("Helen of Troy" or the "Company"), its former Chief Executive Officer ("CEO") Noel Geoffroy ("Geoffroy"), and its Chief Financial Officer ("CFO") Brian Grass ("Grass", and together with the Company and Geoffroy, the "Defendants"). Lead Plaintiffs bring this action on behalf of themselves and all other similarly situated persons or entities who purchased or otherwise acquired Helen of Troy common stock between October 17, 2023 and October 9, 2025, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based upon the investigation conducted by and through Bernstein Litowitz Berger & Grossmann LLP and Bleichmar Fonti & Auld LLP ("Lead Counsel"), which included, among other things, review and analysis of: (i) regulatory filings made by Helen of Troy with the SEC; (ii) earnings releases; (iii) transcripts of earnings calls and investor conferences; (iv) press releases issued and disseminated by the Company; (v) analyst and media reports concerning Helen of Troy; (vi) interviews with former Helen of Troy employees; (vii) economic analyses of securities movement and pricing data; and (viii) other public information regarding the Company, including statements made by Helen of Troy executives. Lead Counsel's investigation into the factual

allegations contained in this Complaint is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation and discovery.

## I. INTRODUCTION[1]

1. This securities fraud class action arises from Defendants' statements to investors concerning Helen of Troy's purported reinvestment of savings into its flagship brands, which was supposed to fuel product and marketing innovation and generate substantial revenue growth.

2. In 2022, saddled with costly integration challenges, cost inflation, and weakening consumer demand, Helen of Troy's performance was faltering. The Company's net revenue had started to slide, and its organic revenue growth stalled altogether.

3. Heading into the start of the Class Period on October 17, 2023, Helen of Troy, a consumer-products holding company based in El Paso, faced a self-described "fundamental inflection point."

4. Market analysts recognized the Company's disappointing performance and sought reassurances that the Company would provide some direction on its plan to improve organic sales growth. For example, after Helen of Troy reported disappointing results in its first quarter of fiscal 2023 on July 7, 2022, one analyst noted that it had "low visibility on resumption of organic sales growth." Another analyst reported that Helen of Troy's lowered guidance was "significantly below [its] expectations," and that it expected the Company's stock to remain depressed "until better visibility emerges for top line drivers in FY23 and beyond."

---

[1] All emphasis added throughout unless otherwise noted.

5. In October 2022, Helen of Troy announced a new "set of global efficiency initiatives" branded as "Project Pegasus." The project, which was designed to expand operating margins by improving efficiencies and reducing costs, was led by Defendant Noel Geoffroy, who was then serving as the Company's COO. The Company told investors that Project Pegasus would create $75 to $85 million in operating profit improvements through fiscal year 2026 (ending in February 2026). These savings were expressly designed to "provide a platform to fund future growth investments."

6. But throughout 2023, the Company's slide continued. Market analysts focused closely on whether the Company could generate organic growth from its premium brands, better integrate its acquisitions, and right the ship. In April 2023, one analyst identified "the key debate for Helen of Troy" as "when/if the company can return to organic revenue growth," after "earnings contraction over the last 18 months."

7. On October 17, 2023, the start of the Class Period, Helen of Troy held an "Investor Day" for the first time in years.

8. That day, Defendant Geoffroy (then-COO and incoming CEO) and Defendant Brian Grass (CFO) revealed the Company's full revitalization plan called "Elevate for Growth." Elevate for Growth purportedly sought to leverage savings from Project Pegasus to invest into Helen of Troy's top-performing brands (termed the "Invest to Grow" brands) to catalyze growth. The Invest to Grow brands, including Hydro Flask, Drybar, Curlsmith, and Osprey, accounted for 56% of Helen of Troy's fiscal year 2023 Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA").

9. Defendants told investors that "***significant reinvestment***" from Project Pegasus savings would lead to "***robust earnings growth***." Defendants also explained that this reinvestment

would have a "flywheel" effect, such that every dollar of savings would lead to far more growth. Thus, Defendants touted that the "Growth strategy fueled by Pegasus is a game changer," such that the Company had reached a "fundamental inflection point" and was "poised for growth."

10. Thereafter, Defendants assured investors that: (i) Project Pegasus savings were "on track" and being reinvested into its purported "Invest to Grow" brands; (ii) Helen of Troy's brands were innovating their products and focusing on successful marketing campaigns and strategies; and (iii) driven by the Company's purported progress in executing on Project Pegasus and Elevate for Growth, the Company would meet its public revenue guidance. For example, on April 24, 2024, Defendant Geoffroy doubled down on the flywheel concept and told investors that: "[W]e ***are generating fuel from Project Pegasus*** to incrementally invest in growth opportunities and capabilities." Market participants credited Defendants' assurances.

11. Unfortunately for investors, Defendants' continued assurances were misleading. In fact, Defendants knew at the time that the Company was not meaningfully reinvesting Project Pegasus "fuel" into its brands. Instead, the Company was cutting brand budgets across the board, discouraging innovation, and allowing relationships with key retailers to fall apart.

12. As set forth herein, multiple former Helen of Troy employees who managed or worked within each of the four identified Invest to Grow brands, and other brands, confirmed that the promised Project Pegasus "fuel" never arrived. For example, one former employee reported that Hydro Flask never got close to the amount of investment promised after the October 2023 Investor Day, while another confirmed that Osprey, Hydro Flask, OXO, Curlsmith, and Drybar were Invest to Grow brands, but there was no indication that the Company was putting additional investment into the Invest to Grow brands.

13. Former employees across Helen of Troy's brand portfolio reported that no meaningful product innovation was taking place, and that Company executives actively stifled innovation, cut marketing budgets, and allowed retailer relationships to deteriorate. For example, one former employee explained that Drybar originally told Sephora in 2023 that it would spend $1 million in marketing with Sephora in 2024, but over the course of 2023 reduced the promised Sephora marketing spend to just $350,000, leading Sephora to drop Drybar products from its brick-and-mortar locations. At the time, that former employee explained, Drybar's Sephora business constituted ***$30 million*** in sales for Helen of Troy, ***60% of which were from brick-and-mortar locations***.

14. Compounding the failure to reinvest Project Pegasus "fuel," Defendants squandered money building a $200 million-plus distribution center in Tennessee that failed to generate promised operational or distributional efficiencies, and spent millions more relocating the Company's beauty brands from a primary industry hotspot in Los Angeles to Boston and renting a second office building in Manhattan for C-suite executives.

15. Defendants also inflated Helen of Troy's public revenue guidance to the point where it significantly exceeded internal brand-level data. Specifically, while publicly-traded reporting companies typically guide more conservatively than internal targets, Defendants did the opposite: one former employee reported that Helen of Troy's investor guidance was routinely inflated by ***15%-20% above internal brand-level targets***. Former employees recall internal confusion and frustration when Helen of Troy would present its guidance to investors because employees working at the brand level knew that the growth the Company promised was unrealistic and inconsistent with the brands' actual prospects for performance. One former employee

described Defendants' investor messaging as a shell game. As one former employee put it, the job was math, and the math was not mathing.

16. The truth about Defendants' misstatements was revealed through a series of corrective events that caused significant price declines in Helen of Troy's stock price, including when (i) Defendants revealed that Project Pegasus savings, which only a quarter previously had been described as "on track," would actually be delayed (April 24, 2024); (ii) the Company missed its inflated revenue guidance (July 9, 2024); and (iii) the Company took multiple impairment charges on its flagship "Invest to Grow" brands that were caused by the "further sustained decline in [its] stock price," and "downward revisions to [its] internal forecasts" and announced further negative sales and earnings results (April 24, 2025; July 10, 2025; and October 9, 2025).

17. These earnings misses and impairments were a direct result of the sustained lack of reinvestment that Defendants misstated and concealed from investors, which diminished the competitiveness of the Company's products, lost retailers and customers, reduced sales, and destroyed the value of Helen of Troy's most important brands.

18. As the fraud collapsed, Geoffroy exited the Company on May 2, 2025, with Grass taking over as Interim CEO. New CEO G. Scott Uzzell assumed control on September 1, 2025. Following the final stock price decline, Mr. Uzzell admitted that the Company had "earned [its] way into a difficult period," and that the Company would finally begin focusing on brands that "have the most promise"—precisely what Defendants falsely assured investors they had been doing since the beginning of the Class Period.

19. All told, because of Defendants' misstatements, Helen of Troy's stock price fell from approximately $109 at the outset of the Class Period to approximately $21 after the final disclosure, causing investors to suffer substantial losses.

## II. JURISDICTION AND VENUE

20. This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

21. This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

22. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and (c). At all relevant times, Helen of Troy had its principal executive offices located in this District, and it conducts substantial business here. In addition, many of the acts alleged herein occurred in this District.

23. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone and Internet communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Lead Plaintiffs

24. Lead Plaintiff City of Atlanta General Employees' Pension Plan ("Atlanta Employees") provides benefits for current and retired employees of the City of Atlanta and their beneficiaries, and permanent employees of the Atlanta Independent School District, except for those required to be members of the Teachers Retirement System of Georgia.

25. Lead Plaintiff City of Atlanta Police Officers' Pension Plan ("Atlanta Police") provides benefits for current and retired officers in Atlanta's Department of Police Services and their beneficiaries.

26. Lead Plaintiff City of Atlanta Firefighters' Pension Plan ("Atlanta Firefighters," and together with Atlanta Employees and Atlanta Police, "Atlanta Plaintiffs") provides benefits for current and retired firefighters of the City of Atlanta and their beneficiaries.

27. Lead Plaintiff Metropolitan Transportation Authority Master Trust, ("MTA") provides benefits for current and retired employees of the Metropolitan Transportation Authority and their beneficiaries.

28. Lead Plaintiff Manhattan and Bronx Surface Transit Operating Authority Pension Plan Trust ("MBSTOA," and together with MTA and the Atlanta Plaintiffs, "Lead Plaintiffs") provides benefits for current and retired employees of the Manhattan and Bronx Surface Transit Operating Authority and their beneficiaries.

29. As indicated in the certifications submitted herewith, each Lead Plaintiff purchased or acquired shares of Helen of Troy common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Defendants**

30. Defendant Helen of Troy, headquartered in El Paso, Texas, markets and sells a variety of consumer goods brands across outdoor, beauty, and wellness segments. Helen of Troy common stock trades on the Nasdaq exchange ("NASDAQ") under the ticker symbol "HELE." As of September 30, 2025, Helen of Troy had approximately 23 million shares of common stock outstanding, owned by hundreds of thousands of investors.

31. Defendant Noel Geoffroy served as CEO of Helen of Troy beginning on March 1, 2024, until her sudden departure on May 2, 2025. Prior to her appointment as CEO, Geoffroy served as Chief Operating Officer ("COO") from May 2022 to March 2024.

32. Defendant Brian Grass served as CFO of the Company from 2014 to 2022, as interim CFO from April 2023 to September 2023, and then again as CFO from September 2023 to May 2, 2025, when Grass was appointed Interim CEO. He served in that interim role through September 1, 2025, and returned to the CFO position after the Company hired a permanent CEO.

33. Defendants Geoffroy and Grass are collectively referred to herein as the "Individual Defendants." The Individual Defendants either made the alleged misstatements or, because of their positions within Helen of Troy, possessed the power and authority to control the contents of Helen of Troy's reports to the SEC and press releases and presentations to market participants. Because of their positions and access to material non-public information, each of the Individual Defendants knew or was severely reckless in not knowing that the alleged misstatements were materially false and/or misleading.

## IV. SUMMARY OF THE FRAUD

### A. Helen of Troy's "Roll-Up" Business Model and Brand Portfolio

34. Helen of Troy is an "asset-light brand owner and operator" that focused traditionally on beauty and household brands. In recent years, the Company has embarked on a "roll-up strategy" of growth whereby it acquires existing brands and continues to market them independently while consolidating certain back-office tasks like billing, human resources, and marketing.

35. Between 2015 and 2022, Helen of Troy acquired several major Health & Wellness, Home & Outdoor, and Beauty brands to join its existing foundational brand portfolio. These large acquisitions included the Hydro Flask outdoor lifestyle brand in 2016 ($210 million), the Drybar haircare brand in 2020 ($255 million), the Osprey home and outdoor brand in 2021 ($414.7 million), and the Curlsmith haircare brand in 2022 ($150 million). The Company also signed an exclusive global license to market Revlon haircare appliances and tools for 100 years in 2020 for

$72.5 million. The new acquisitions added to existing Helen of Troy brands, including houseware brand OXO, water filtration brand PUR, and healthcare and wellness brands Vicks, Braun, and Honeywell.

### B. Defendants Misled the Market That They Were Embarking on a Comprehensive Revitalization Centered on Restructuring and Reinvestment

36. Although Helen of Troy received an initial revenue and sales boost from its numerous acquisitions, the Company failed to show that it could generate organic sales growth. By 2022, the Company's net income began to slide. Helen of Troy's stock price also lost more than half its value over the course of calendar year 2022.

37. By 2023, Helen of Troy's organic revenue growth had stalled altogether, and the Company acknowledged that it needed to transition from an acquisition-driven model to one focused on organic growth. Analysts and investors were intensely focused on whether Helen of Troy could generate organic revenue growth from its premium brand portfolio, properly integrate future acquisitions, deliver products to customers efficiently, and improve its cost structure.

38. In a bid to convince investors that Defendants could revitalize the Company, Defendants announced that the Company was embarking on a two-part initiative to streamline its operations and reinvest savings into its brands with the strongest potential.

39. ***First***, during the second quarter of fiscal year 2023 (the quarter ended August 31, 2022),[2] Helen of Troy initiated Project Pegasus, a global restructuring plan intended to expand operating margins through initiatives designed to improve efficiency and effectiveness and reduce costs. Project Pegasus targeted annualized pre-tax operating profit improvements of approximately $75 million to $85 million, which was expected to begin in fiscal 2024 (March 2023) and was

[2] Helen of Troy reports quarterly results using a fiscal year beginning on March 1 and ending on the last day of February.

expected to be substantially achieved by the end of fiscal 2026 (February 2026). The Company's original estimated savings cadence was approximately 25% in fiscal 2024, 50% in fiscal 2025, and 25% in fiscal 2026. The Company stated that it anticipated these initiatives would create operating efficiencies "as well as provide a platform to fund future growth investments."

40. As part of Project Pegasus, Defendants represented that the Company undertook a significant organizational restructuring. Helen of Troy combined its Health & Wellness and Beauty segments into a single "Beauty & Wellness" segment, created a North America Regional Market Organization, centralized certain functions under global shared services, and reduced the global workforce by approximately 10%. Another part of Project Pegasus was Helen of Troy's new distribution center in Gallaway, Tennessee, which the Company later coined the "Iron Giant." The Company represented that its plan was to consolidate distribution of products into this center. As the former CFO of Helen of Troy Matt Osberg explained on a January 5, 2023 earnings call, "Our new distribution center, the consolidation of our distribution footprint will be a lot of things that can help us be more efficient in inventory." In a press release published on the same day, Helen of Troy represented that it expected construction of the facility "to be completed by the end of fiscal 2023."

41. ***Second***, Helen of Troy unveiled a long-term strategic plan at an Investor Day on October 17, 2023. Because the Company had reached a self-described "inflection point," the purpose of the strategic plan was to reassure the market that the Company had a comprehensive strategy to stem its recent declining performance and transform the Company from a cost-focused operator into a growth-oriented consumer products platform.

42. Defendant Geoffroy announced the plan, which was called "Elevate for Growth." She told investors that the strategy was designed to invest the so-called "fuel" from Project Pegasus

into the Company's top brands to enhance revenues. In its presentation to investors, the Company specifically highlighted investment in its brands as the keystone of the Elevate for Growth strategy, and as a demonstration of its purported commitment to building on the Company's brands' strengths:




43. Elevate for Growth involved a three-tier portfolio management strategy. The first tier, "Invest to Grow," comprised the Company's fastest-growing, most financially attractive brands, which were to be resourced so they could grow faster than the external category. The second tier, "Stronghold," consisted of stable and growing brands, which were to be resourced so they performed at least in line with the category. The third tier, "Optimize," included brands where the Company was assessing future action—potentially a source of cash with minimal resources, or candidates for divestiture.

44. Geoffroy told Investor Day participants that the portfolio classification was "particularly critical right now as we look to reinvest back in the business," and that the Company was "leveraging the incremental fuel generated by Project Pegasus with the brand portfolio

classification to enable us to focus our investment on the most attractive opportunities." Geoffroy described this as "a big moment for our brands, especially our Invest to Grow brands." She explained further, "We are looking to supercharge organic revenue growth in a way we haven't been able to before, leveraging the fuel from Project Pegasus."

45. Similarly, Grass touted the combination of Project Pegasus and the newly announced Elevate for Growth as "an inflection point" and a "game-changer" for the Company. Grass reiterated this by showing a slide entitled "Why Invest in Helen of Troy," where, in the section subtitled "Why Now," the first two bullet points stated:

- ***"Business fundamental inflection point; poised for growth;"*** and
- ***"Growth strategy fueled by Pegasus is a game changer."***

46. Helen of Troy explicitly tied the Elevate for Growth reinvestment plan to the Company's guidance. For example, the Company explained in its Investor Presentation which accompanied Defendants' statements to the market on the October 17, 2023 Investor Day, that the Company's expected sales and adjusted EPS growth "assume[d] . . . reinvestment" of Project Pegasus savings:

## Introduction to *Elevate for Growth*

**Executive Summary**

- We estimate strong financial outcomes over the course of the plan, built by bottom-up **organic revenue growth** assumptions, **acquisition and divestiture** inputs, and **required investment** inputs
- We modeled various scenarios and selected one we believe to be **most representative** of a potential outcome for purposes of setting **average annual organic targets** and **presenting illustrations** for perspective
- Model assumes organic revenue growth in line with **brand prioritization** and **two acquisitions** in 2H FY26 and 1H FY28 (each $300M purchase price with $150M revenue and $25M EBITDA) for **illustrative purposes** as timing and transaction economics cannot be reasonably estimated
- Model assumes **Pegasus savings** in line with previous disclosures and a **reinvestment** of a portion of that savings; **divestiture** in Q1 FY25 and annual **share repurchase of $100 million** for **illustrative purposes**
- Model assumes key input costs such as **commodities and freight** to remain at **current levels,** slight moderation in **interest rates** beginning in FY25, and **other inputs** were assumed to **increase by low single digits** beyond FY25

**Average Annual Organic Target Highlights**

| | |
|---|---|
| **Net Sales Growth** [1] | 3.0 - 4.0% |
| **Adjusted EBITDA Margin Expansion** | 30 - 40 bps |
| **Adjusted EPS Growth** [2] | ≥10% |
| **FY30 Return on Invested Capital (ROIC)** | ≥18% |
| **Reinvestment / Earnings Growth Ratio** | 67% / 33% |
| **Growth Investment % of Sales** | ≥9% |

(1) Excludes acquisitions, divestitures and material currency fluctuations
(2) Excludes acquisitions, divestitures, and material currency fluctuations; includes share repurchases

Proprietary and Confidential

Helen of Troy Elevate for Growth

47. Although Defendants refused to publicly disclose how each of the Company's brands would be classified, Helen of Troy's Investor Day presentation slide deck confirmed that several "Recent Acquisitions" would be classified as Invest to Grow brands: Hydro Flask, Drybar, Osprey, and Curlsmith.

## Recent Acquisitions of High Growth Assets at Attractive Multiples Have Enhanced the *Invest to Grow* Portfolio and Created Significant Value

| | Hydro Flask | drybar | OSPREY | CURLSMITH |
|---|---|---|---|---|
| **Purchase Price** | **$210M** | **$255M** | **$414M** | **$150M** |
| **HELE EBITDA Trading Multiple** | **12.0x** | **16.4x** | **17.5x** | **15.0x** |
| **Acquisition EBITDA Multiple** | **11.6x** | **13.0x** | **13.5x** | **10.0x** |
| **Discount** | **$7M** | **$67M** | **$128M** | **$81M** |
| **Realized Sales Growth*** | **33%** | **12%** | **15%** | **41%** |
| **Modeled Sales Growth** | **28%** | **10%** | **15%** | **24%** |
| **Cumulative Valuation at 12x EBITDA** | **$2.213 Billion** | | | |
| **Cumulative Purchase Price** | **$1.029 Billion** | | | |

*Actual Realized Sales Growth from acquisition date through FY24E for Drybar, Osprey and Curlsmith; Hydro Flask Realized and Modeled Sales growth presented through end of five-year acquisition model FY17-FY21

Proprietary and Confidential

Helen of Troy Elevate for Growth

48. Defendants set specific financial targets for each tier. For the Invest to Grow tier, the Company targeted approximately 6% organic compound annual growth rate ("CAGR"), with average gross profit margins of approximately 58%. For Stronghold brands, the target was approximately 3% CAGR, with average gross profit margins of approximately 50%. The four Invest to Grow brands above comprised 56% of the Company's EBITDA.[3]

49. The Investor Day slide below confirms that the Invest to Grow brands comprised the majority of Helen of Troy's net sales—and illustrates Defendants' claim that these brands would outgrow the rest of the Company and become an even larger slice of the pie:




50. At the Investor Day, Grass explained, "***We expect to invest roughly two-thirds of that profit improvement back into brand-building and new product development to feed the***

[3] The statement above, valuing those brands at $2.213 billion at 12x EBITDA, implies annual EBITDA of $184.4 million, while Helen of Troy as a whole reported Adjusted EBITDA of $327.52 million for fiscal year 2023, the most recent fiscal year completed prior to the Investor Day.

***flywheel***, which leaves roughly 10% for annual adjusted EPS growth. And we think we can rinse and repeat each year during Elevate for Growth. Adding in operating leverage as yet another driver beginning in fiscal 2026." A slide in the presentation accompanying this comment illustrated that Project Pegasus and the Invest to Grow brands were among the largest drivers of earnings growth:




51. To support this plan, Geoffroy announced the creation of a "North American Regional Marketing Organization" which would "identify opportunities to leverage our scale and ***elevate our partnership with key customers***," explaining that the Organization's Director "***has worked to prioritize the opportunities in retailers***, so that we disproportionately resource and prioritize the biggest and most attractive opportunities."

52. Defendants also said that Helen of Troy had already made progress towards these goals. For example, during the October 17, 2023 Investor Day, Geoffroy assured investors that the Company's reinvestment plan was already underway, and that the Company was "investing in enhanced marketing mix modeling capabilities," a statistical methodology that uses historical sales and marketing data to measure the effect of various marketing activities on business outcomes, "to optimize the ROI of our marketing investment across the portfolio and within each brand's

strategic choices." The Company also assured investors in the Investor Day slide deck during Grass's remarks that the construction of the Tennessee distribution facility (which it was now calling "Iron Giant") was "[l]argely on time and on budget despite Covid and post-Covid disruption."

53. During Geoffroy's prepared remarks she presented a slide entitled "Why ***I*** Am Excited About the Future of Helen of Troy." Therein, Geoffroy explained that the "[n]ew fuel" generated from Project Pegasus savings would be reinvested into the Company's brands for the specific purpose of funding "growth opportunities and capabilities":




54. During Grass's remarks, he presented a slide that highlighted particular strengths of Invest to Grow brands Drybar, Osprey, and Curlsmith that would provide a "[s]trong [p]latform" for the Company's growth projections. Specifically, Grass emphasized Drybar's "[h]igh growth" classification, that Osprey was "now capitalizing" on its "robust product line," and that Curlsmith was "fast growing" and "high margin." He also referred to Project Pegasus creating "greater

efficiency, scale, and productivity." And he touted the Company's new "Iron Giant" facility in Tennessee, which was "[l]argely on time and on budget," as providing "expected operating leverage for years to come."




55. Analysts took note of Defendants' assertions about their supposed revitalization efforts. D.A. Davidson analysts reported on October 17, 2023 that "Elevate for Growth will focus the investment in the Invest to Grow brands." They said that they felt "optimistic about HELE's future," stating that "Project Pegasus greatly improves HELE's operating efficiency and provides 'fuel' to be invested to drive growth." Similarly, Raymond James analysts concluded that one of the "[k]ey drivers of growth" for the Company was "improved growth in its 'Invest to Grow' portfolio," leading them to maintain their Market Perform rating of HELE's stock. On October 19, 2023, UBS reported that Geoffroy "stated specifically that some of the brands within the portfolio have been 'under-invested' in, suggesting that a significant ramp may be on the horizon," and noted that they felt "more constructive on the company's ability to generate bottom line growth/flexibility for reinvestment, especially over the next couple of years driven by (1)

continued cost savings from Project Pegasus[.]" Canaccord Genuity analysts "believe[d] that a lot of margin gains will come from Project Pegasus cost savings."

### C. Throughout 2024 and the First Half of 2025, Defendants Falsely Assure Investors That Helen of Troy is Prioritizing Innovation and Employing Its Consumer-Focused Strategy in Brands With Highest Potential Return on Investment (ROI)

#### 1. January 8, 2024 — Q3 FY2024 Earnings Call

56. On January 8, 2024, Helen of Troy held its third-quarter fiscal year 2024 earnings call—the first major earnings event following the October 2023 Investor Day. Defendants used this call to reaffirm the reinvestment narrative, assuring investors that the Pegasus savings were actively "***on track***" for reinvestment within the Invest to Grow classification framework. Geoffroy claimed that both the incremental funding and the more focused allocation approach would produce a "double benefit." Specifically, Defendant Geoffroy stated,

> As we go into next year, that's really where the bulk or the majority -- a bigger part of the savings come into play. And that comes from some of the cost of goods initiatives that we saw. And again, we feel very good about those initiatives. ***They're on track, and that becomes the fuel that we can use to reinvest back in the business leveraging the new portfolio classification that we laid out, Invest to Grow, Stronghold and optimize. So we really get a double benefit there, right? We're able to invest the incremental fuel, but we're also doing it in a more focused way, I guess, the opportunities that we think are most appeal[ing] and best ROI is attractive***.

57. Grass also affirmed that the Company was on track, and linked Company guidance to Project Pegasus, stating,

> ***We continue to expect Pegasus to provide the fuel and operational improvements that allow us to achieve the objectives we outlined in our Investor Day which are average annual growth rates of 3% to 4% for net sales, 30 to 40 basis points of adjusted EBITDA margin expansion and at least 10% adjusted EPS growth***.

58. And the Company again assured investors in its investor presentation that the Iron Giant "Project" was "largely on time and budget despite significant macro disruption."

59. Analysts credited Defendants' statements in making stock recommendations. For example, in a January 8, 2024 report, Canaccord Genuity analysts noted Defendants' guidance that "[s]ales continued to see leadership brands drive growth," and reiterated their "Buy" rating and $143 price target, stating, "We believe HELE is on the right track to not only execute its Project Pegasus efficiency plan to improve EBIT by $75M-$85M annually by FY26, but also their Elevate for Growth plan unveiled during their October investor day." The next day, a D.A. Davidson & Co. analyst raised her firm's price target to $151 from $137, reporting that "management sounds more confident about returning to Y/Y sales growth in F4Q24 or in early FY25." Similarly, UBS analysts reported that they "came away from the earnings call/management callback with increased conviction that cost savings and margin recovery should drive solid bottom line growth in the years ahead," and maintained their neutral rating on company stock.

**2. April 24, 2024 — Q4 FY2024 Earnings Call**

60. On April 24, 2024, Helen of Troy reported its fourth-quarter and full fiscal year 2024 results and issued its fiscal year 2025 outlook. The results were disappointing. The Company's fiscal year 2025 adjusted EPS guidance of $8.70–$9.20 missed the analyst consensus estimate of $9.71, and its net sales guidance of $1.97–$2.03 billion fell short of the consensus of $2.04 billion. The Company also disclosed that the cadence of Project Pegasus savings had been pushed back: the Company now reduced its original savings estimate for fiscal year 2025 (from 50% to 35%) and extended the shortfall into fiscal year 2027.

61. As referenced above, Defendants had previously told the market that Project Pegasus was an inflection point in the Company's turnaround and repeatedly emphasized that savings from the initiative were "on track," including as recently as January 8, 2024.

62. The stock price dropped from $100.28 on April 23, 2024 to $90.71 on April 24, 2024, an approximately 10% drop, which analysts specifically linked to the savings miss. For

example, analysts at Raymond James noted the "limit[ed] visibility into the recovery acceleration" promised by Defendants caused in part by the "slower realization of savings." D.A. Davidson cut its earnings per share estimates by 8%, citing one of the reasons as "push-out . . . cost savings," and similarly, Raymond James noted "flattish results [year-on-year] on category pressures and less savings from the Pegasus restructuring plan."

63. However, Defendants continued to falsely and misleadingly assure investors that Helen of Troy's stated plan to reinvest Project Pegasus savings in its brands to stimulate growth was underway and on track.

64. ***First***, Defendants characterized the results in a press release as "Solid" and initiated a strong fiscal 2025 outlook of Adjusted Diluted EPS of $8.70-$9.20 per share.

65. ***Second***, Defendant Grass misleadingly suggested that this significant savings delay was merely a product of the Company's desire to "further invest in the health of our brands," and that the new delayed savings cadence "reflect[s] the choices we are making to maximize the benefits of these initiatives." In fact, Grass told investors to expect "EBITDA margins to decline roughly 40 basis points as benefits from Pegasus and other gross profit improvements are ***reinvested for growth***."

66. ***Third***, on that same call, Defendant Grass reassured investors that the Company had "no concerns about [the Company's] ability to ultimately achieve the Pegasus savings[—it] will just come a little bit later." Grass also tied the Company's fiscal year guidance to its reinvestment strategy, noting that the "***[w]ith the fuel from Pegasus, the operational improvements we've made and our Elevate for Growth strategies***, we believe we are well positioned to navigate what we expect will be a softer consumer spending environment." Likewise, Geoffroy emphasized that she was "confident that [the Company's] strategic plan and efforts

position us to achieve our fiscal 2025 objectives," and she affirmed that Helen of Troy would use a "100-basis-point investment," which came out of the "fuel from Project Pegasus." She further asserted that the Company would "lean into those brands and invest in the areas that we think the ROI is very good."

67. ***Fourth***, when asked by an analyst to "provide additional color on the building blocks to drive the improvement in revenue," and what would be "driving retailers to increase [the Company's] distribution if the macros are not in favor?", Geoffroy responded by highlighting some of the "new innovation[s]" in the brands' product lines, pointing to Drybar's "[H]ot Roller Club" as one of the Company's "newest innovations."

68. Analysts credited these reassurances. For example, Canaccord Genuity stated in an analyst report that day that "[o]verall, [they] came away incrementally more positive on management's ability to drive brand growth," and they "believe[d] HELE is in good hands with new CEO Noel Geoffroy," concluding this was a "good buying opportunity for a company poised to return to growth with strong brands, solid free cash flow, and a deleveraging balance sheet." A D.A. Davidson & Co. analyst maintained her "Buy" rating, reporting that "[m]anagement decided to increase strategic growth investment in FY25." UBS analysts maintained their "Neutral" rating of the Company's stock, noting that one of the "Key Takeaways" was that "[m]anagement fe[lt] that it ha[d] reasonably good visibility into top line improvement beginning in 2Q, driven by factors that are known/in its control," and "spoke to confidence that the guidance is achievable even without material improvement in consumer demand and the overall macroeconomic environment." Similarly, Raymond James reported it would "[m]aintain [its] Market Perform rating as the company's self-help actions like the Project Pegasus restructuring program . . . are balanced by a slow build towards top-line recovery."

69. The following day, Canaccord Genuity reiterated its "Buy" rating after a fireside chat with Geoffroy and Grass, reporting that "[u]pbeat meetings with management signal confidence in FY25 guide and return to sales growth," and that "[m]anagement was confident in their FY25 guide for sales and earnings along with the expectation for sales to inflect positively in 2Q through 4Q as they expect marketing and brand investment, innovation, shelf space gains, to help drive a return to sales growth."

**3. July 9, 2024 — Q1 FY2025 Earnings Call**

70. On July 9, 2024, Helen of Troy reported its first-quarter fiscal year 2025 results. Net sales of $416.8 million declined 12.2% year-over-year, badly missing the analyst estimate of $445.8 million. Adjusted EPS of $0.99 fell far short of the consensus estimate of $1.59. Beauty & Wellness net sales fell 15.3%.

71. The Company was forced to slash its full-year revenue outlook just 3 months after it was issued, cutting sales guidance to $1.885-$1.935 billion from $1.97-$2.03 billion and EPS guidance to $7.00-$7.50 from $8.70-$9.20. CEO Geoffroy acknowledged the Company had faced "an unusual number of ***internal*** and external challenges." A Helen of Troy press release quoted Geoffroy in stating that the lowered annual outlook would impact the Company's Elevate for Growth plan, as it "***delays the delivery of the long-term financial algorithm in our strategic plan***."

72. Defendants also revealed delays in the Iron Giant distribution facility startup. Specifically, Geoffroy revealed that the Company had "encountered some near-term disruption" with the facility which "created some unexpected challenges affecting our fulfillment of small retail customer and direct-to-consumer orders for OXO and Hydro Flask," resulting in "lost revenue, delayed productivity savings and additional costs." Geoffroy also admitted that "[t]he resulting shipping backlog was a factor that drove our net sales miss in the quarter."

73. Investors were surprised and deeply concerned by these disclosures, and the stock tumbled 27.7%, or $24.68, from a closing price of $89.01 on July 8, 2024, to a closing price of $64.33 on July 9, 2024. The stock continued to fall the following day, closing at $61.36 on July 10, 2024, another 4.6%, hitting a record low for the Company since 2014. Bloomberg reported that, as of July 10, Helen of Troy was "priced at 0.9 times book value."

74. Analysts concluded that these results were "***materially worse than expected***," attributing these results in part to "a combination of low visibility into the sales recovery path," and "a need for increased investment spend" (Raymond James). UBS analysts reported the 12.2% decline in sales, which were nearly 40% below street expectations, and characterized the results as "very disappointing." Similarly, D.A. Davidson analysts described the Company's disclosure as "[a] big sales disappointment," and "surprising, given that guidance was issued two months into the quarter." And analysts connected these results in-part to the distribution facility delays, with Raymond James, for example, reporting that the guidance miss was "***further exacerbated*** by a series of company-specific execution challenges, most notably with the integration of the Curlsmith acquisition ***and the startup of its Tennessee distribution center***."

75. Despite these negative results, Defendants doubled down on the reinvestment and growth narrative. Geoffroy represented that the Company, which had been investing in the brands since "fiscal 2024," had developed a comprehensive brand-building framework and implemented a new marketing analytics strategy:

> Beginning in fiscal 2024, we refocused on the health of our brands and ***invested in elevating our brand-building fundamentals by developing and implementing a Helen of Troy brand-building framework across our entire marketing organization***. This entailed a rigorous approach to quantitatively define and segment the market, selecting who we are serving and clarifying what our brands stand for. ***All our marketing content, activation and innovation will be grounded in these revitalized, data-centric brand strategies***.

76. In the same call, Geoffroy described having personally received "marketing mix modeling data" that showed "fairly positive ROIs [returns on investment] across our portfolio," and affirmed that savings from Project Pegasus were currently "***being reinvested back into our brands***."

77. Once again, analysts took Defendants at their word that their reinvestment and new marketing analytics approach would help improve the Company's financial standing. For example, in a July 12, 2024 report following meetings with Geoffroy and Grass, Oppenheimer & Co. analysts reported that "[d]espite the challenging quarter just reported, the company is still confident in its Elevate for Growth strategy." Echoing Defendants' statements, the analysts explained that "management believes there has not been sufficient investment in key brands in recent years," and that "[a]s a result, the company is on target to ramp up growth investments (marketing, R&D, etc.) to ~8% of sales this year, with an eventual step-up to 9%." And analysts from Canaccord Genuity maintained their "Buy" rating, highlighting in the title of their report after the earnings call that the Company's "refocus on brand building" would be "positive longer term."

**4. August 21, 2024 — Annual General Meeting**

78. During the Company's Annual General Meeting on August 21, 2024, Defendant Geoffroy again took the opportunity to assure the market that the Company had been and was actively and presently "executing on" her savings and reinvestment campaign. Specifically, Geoffroy stated,

> ***We have significantly increased our growth investment to fuel both marketing and product innovation, and we are increasing our distribution footprint***. We believe that ***executing on*** these actions with excellence will put us on the path to growth. We are already seeing market share improvement, telling us that we are moving in the right direction.

**5. October 9, 2024 — Q2 FY2025 Earnings Call**

79. On October 9, 2024, Helen of Troy reported second-quarter fiscal year 2025 results showing net sales of $491.9 million, a decline of 3.5% year-over-year. The Company maintained its already-lowered outlook. However, Defendant Geoffroy provided even more detail about the benefits Helen of Troy was already realizing thanks to the Company's supposed "marketing mix model":

> [W]e did a ***very robust first time ever marketing mix model that allows us to understand our return on ad spend across all the brands in our portfolio***, but also importantly, every single tactic that we use. So, ***we're able to optimize our spend across the brand portfolio***, but also importantly across the tactics, so that we can look across upper and lower funnel and really optimize against that return on investment and the reach that we're looking to get.

80. Analysts continued to be reassured by Defendants' representations that the Company's marketing investment was paying off. For example, on October 9, 2024, Canaccord Genuity analysts raised their price target from $84 to $92, attributing the quarter's results in part to "improving marketing and innovation." The analysts stated that "[m]anagement's recent initiatives including a renewed focus on product innovation, driving incremental distribution gains both domestically and internationally, and investing in brand building through marketing has already started to bear fruit in our view," and they concluded that "there is still a lot of opportunity left as management executes their growth and Pegasus savings plan." Analysts at Baptista Research also published a report on the Company, noting that it had "prioritized" "[i]nvestment in marketing and innovation," and ultimately giving the Company a "Buy" rating.

**6. January 8, 2025 — Q3 FY2025 Earnings Call**

81. On January 8, 2025, Helen of Troy reported third-quarter fiscal year 2025 results showing net sales of $530.7 million, a decline of 3.4% year-over-year. Despite the continued decline, Defendants continued to represent to investors that their strategy was working. Defendant

Geoffroy represented that Project Pegasus "remains on track" in its cost savings measures, which in turn was "having a positive impact" on gross profit margins and "providing critical fuel for reinvestment." When an analyst asked whether their targets from the October 2023 Investor Day were still achievable, she reiterated that they "haven't revised them."

82. Defendant Geoffroy also stated,

> ***[W]e continue to use our marketing mix modeling data to prioritize investment opportunities across our brand portfolio and also to select the marketing tactics where we see the best ROI potential.***

83. On the same call, Defendants represented that the Company had further ***increased*** its growth investments in marketing and innovation by 120–130 basis points year-over-year.

84. Analysts again credited Defendants' representations and believed that the Project Pegasus reinvestments were "start[ing] to bear fruit." For example, in a January 14, 2025 report titled "Upbeat management team highlights progress with initiatives," Canaccord Genuity reported that "Project Pegasus is on track for ~$30M in savings in FY25, helping management reallocate savings into brand marketing and innovation investment," and that "management was upbeat at the conference as we are starting to see recent investments in home & outdoor brands start to bear fruit, and management is making investments in beauty brands for 2025."

**7. January 13, 2025 — ICR Conference**

85. Just five days later, on January 13, 2025, Geoffroy made specific representations about the success of the Company's reinvestment strategy at the ICR Conference. Geoffroy described Project Pegasus as having been specifically designed to "generate fuel to reinvest back in the brands" and claimed that "we've been successful in doing that":

> And that's one of the most important things that I've been really looking to do since I joined the company is get our investment in our brands for both marketing and innovation to a much higher level than what we've had in the past. ***And we've been successful in doing that***, as well as putting in data and analytics, so that when we're making that investment, ***we have a much better understanding with data and***

> ***analytics of where the ROI is***, what's working, what's not working, so that we can shift accordingly.

86. Geoffroy also made explicit assurances about three Helen of Troy brands that had received reinvestment from Project Pegasus savings to spur product and marketing innovation. Specifically, Geoffroy told investors that two of the identified Invest to Grow brands (Hydro Flask and Osprey) and an additional brand (OXO) had been "***the recipient of***" reinvestment funds focused "***both on the innovation side, so, we've got some great innovation that's working hard for us there; as well as on the marketing side***."

**8. April 24, 2025 — Q4 FY2025 Earnings Call**

87. On April 24, 2025, Helen of Troy reported fourth-quarter and full-year fiscal year 2025 results. Full-year fiscal year 2025 consolidated net sales were $1.908 billion, a decline of 4.9% year-over-year. Beauty & Wellness net sales decreased 8.0%, adjusted diluted EPS decreased from $8.91 to $7.17 over the prior year, and free cash flow plummeted from $269.4 million to $83.1 million.

88. Helen of Troy also surprised the market by announcing that it was taking a $51.5 million goodwill impairment during the fourth quarter of fiscal year 2025 on Drybar, one of Helen of Troy's flagship brands, and one of the four identified Invest to Grow brands Defendants had previously assured investors were receiving an outsized share of reinvestment. In other words, Helen of Troy was forced to disclose that the value of Drybar as an asset of the Company was worth significantly less than what Helen of Troy spent to acquire it and recognize the shortfall as an expense for the Company on its financial statements. Defendants revealed that the impairment was attributable to Drybar "experienc[ing] a decline in net sales revenue due to lower consumer demand, increased competition, and net distribution declines," thus demonstrating that the Company had not actually engaged in the type of marketing analytics and reinvestment for product

innovation necessary to beat competition that Defendants previously assured investors were underway and already successful.

89. The Company also noted a decline of diluted adjusted earnings per share of 4.9%. In addition, it reported declines in "Organic business," of 8%, driven primarily by "lower Beauty hair appliance sales." Home & Outdoor also suffered a decline of 5.8% in operating income, which the Company ascribed to a "less favorable product and customer mix and an increase in restructuring charges." Defendants stated they were implementing several measures to reduce costs, including suspending non-critical projects and reducing marketing, promotional and new product development expenses. Finally, Geoffroy revealed that the Company was retreating from offering fiscal-year 2026 guidance altogether and that the Company was ***"stepping back from the long-term algorithm we laid out at our Investor Day in October 2023***."

90. As a result of these disclosures, the price of Helen of Troy's common stock declined by $4.08 per share, or nearly 12%, from a closing price of $34.12 on April 23, 2025, to a closing price of $30.04 on April 24, 2025.

91. Analysts were surprised by these revelations and repeated them in their reports following the disclosures. For example, Raymond James and CGS International opined that the Company's suspension of "projects and capex not critical to supplier diversification, and reduc[tion] [of] marketing, promo, and innovation spend" did "not seem a sustainable strategy." Similarly, Oppenheimer analysts noted that while cost-cutting might be prudent short-term, they "will be focused on potential market share impacts down the road."

92. However, Defendants continued to mislead investors and minimize concerns. On a call with investors that same day, Geoffroy stated that Defendants "continue to believe in the longer term prospects for the Drybar business and continue to make progress on improving its

fundamentals." In addition, she repeatedly affirmed previous claims that Project Pegasus fuel "was to fund our growth investment." In its corresponding 10-Q SEC filing, Defendants also falsely assured investors that the Company would avoid further impairment charges dependent upon "the execution of our Elevate for Growth Strategy," despite the fact that, unknown to investors, Defendants had already failed to execute on the savings and reinvestment campaign central to the strategy.

93. Despite repeatedly reassuring investors of the Company's success in reinvesting savings in marketing and innovation (including as recently as the prior quarter), Defendants also revealed that Helen of Troy was now "implementing" cuts to spending previously earmarked for "marketing, promotional, and new product development." However, Geoffroy assured investors that the Company had not, in fact, fully abandoned its reinvestment and innovation campaign. Specifically, Geoffroy claimed that "reducing ***any*** marketing or innovation expense ***will be one of the last levers that I want to pull***," and that "***if we get to a point that we need to do that***," the Company will still be able to "leverage all of the new marketing mix capability that we've built to optimize that investment in areas where we've got the highest ROI."

94. Analysts credited management's assertions. For instance, Oppenheimer & Co. maintained its "Perform" rating for the Company's stock, attributing its conclusion in part to the "tone of management," which analysts found "constructive with regards to its innovation pipeline and efforts."

95. However, a week later, on May 2, 2025, after trading hours, Helen of Troy announced that Defendant Geoffroy had stepped down as CEO, effective immediately. Defendant Grass was named interim CEO. On the next full trading day, Helen of Troy stock fell over 10%, from $28.21 on May 2, 2025 to $25.29 on May 5, 2025. As one analyst with The Motley Fool

observed, "While some CEO departure announcements are greeted with an appreciation in a struggling stock on hopes of a turnaround, apparently, the market took Helen of Troy's announcement as a sign things may be worse under the surface."

**D. July 10, 2025: Defendants Reveal a $414.4 Million Impairment on the Invest to Grow Brands, including Hydro Flask, Drybar, Osprey, and Curlsmith**

96. Approximately two months later, on July 10, 2025, Helen of Troy revealed in its first quarter fiscal year 2026 press release that the Company had taken a $414.4 million goodwill impairment that impacted more of its purported high-investment brands, including Hydro Flask, Drybar, Osprey and Curlsmith. Specifically, Defendants reported in their SEC Form 10-Q that, of the total $414.4 million of goodwill that the Company was writing off, those four brands accounted for $120.8 million, $103.7 million, $98.3 million, and $36.2 million, respectively. This means that ***86.6% of the total impairment taken was attributable to the four identified Invest to Grow brands.***

97. Defendants attributed the impairment to continued decelerating revenue growth. In addition, they disclosed that net sales had declined by 11% year-over-year and adjusted earnings per share had declined by nearly 60%. Defendants also revealed that Helen of Troy was suspending non-critical projects and capital expenditures.

98. In a shocking about-face, Interim CEO Brian Grass candidly admitted,

> ***[W]e must get back to fundamentals and move with greater speed. Candidly, we lost some of that along the way. [We] became too matrixed, too slow, and at times, disconnected from each other and the marketplace. We made our company too complicated and lost focus on what made our businesses great. I own that as a leader.*** Now, time to simplify, refocus, and accelerate.

99. This news surprised investors, with Canaccord analysts downgrading their rating of the Company from Buy to Hold, noting that these trends were "***worse than we expected***," and opining that the Company had "no clear [sight] to an inflection to positive sales." Analysts from

Raymond James similarly reported that "HELE results widely missed expectations," and pointed specifically to softness in categories like "insulated beverageware (Hydro Flask) in Home & Outdoor and fans, hair appliances, and prestige hair care products in Beauty & Wellness." Another Raymond James report noted that management needed to focus on "innovating faster" and that the Company had "lagged behind peers" in innovation. Behind the Numbers analysts noted that "[f]or a seemingly simple company," Helen of Troy "***consistently managed to raise accounting flags***," and described its reported earnings this quarter as "disastrous."

100. After the announcement, the price of Helen of Troy's common stock declined by $7.04 per share, or nearly 22.7%, from a closing price of $31 on July 9, 2025 to a closing price of $23.96 on July 10, 2025.

101. Despite these disclosures, in its press release the Company continued to reassure investors that Helen of Troy had "resumed targeted growth investments," and "optimized marketing, promotional and new product development investments," with a focus on "opportunities with the highest returns." Notably, this is the first earnings release in the Class Period that made no mention of the (failed) "Elevate for Growth" initiative.

**E. October 9, 2025: Defendants Reveal the Full Scale of Its Losses, Reporting Its Cumulative Impairments Have Reached $740.8 Million, with Hydro Flask Goodwill Written to Zero, and the New CEO Admits "Strategies and Execution Have Fallen Short"**

102. Finally, on October 9, 2025, Helen of Troy revealed the full scale of its losses to investors, disclosing in a press release that the Company had taken yet another $326.4 million of impairments, reaching $740.8 million in total impairments. The impairments were concentrated on brands the Company had classified as part of its "Invest to Grow" tier. Specifically, Hydro Flask and Osprey had an impairment of $44.7 million and $40.8 million, respectively, between

June and August 31, 2025 and $165.5 million and $139.1 million, respectively, for the six months ended August 31, 2025.

103. In its Form 10-Q filed with the SEC for the quarter, Defendants revealed that this impairment reduced the carrying value of Hydro Flask's goodwill to zero. In the Beauty & Wellness segment, including Health & Wellness brands, Drybar, Curlsmith and Revlon, the impairment constituted $160.9 million, $47.8 million, $28.4 million and $3.9 million, respectively, for the three months ended August 31, 2025; and $196.6 million, $151.4 million, $64.6 million and $23.5 million, respectively, for the six months ended August 31, 2025. The Company further announced quarterly sales were down 8.9% year-over-year and attributed these results to the sustained decline in its stock price, admitting that "[a]dditional factors" leading to the impairment calculation specifically included downward revisions to their "internal forecasts and strategic long-term plans."

104. In an earnings call with investors later that day, newly appointed CEO G. Scott Uzzell admitted that the Company had "***earned*** [its] way into a difficult period," and that "clearly, we need to ***behave our way back*** to high-quality sustainable growth." He acknowledged that the Company was facing "challenges," and there are "no quick fixes," to get the brand on a "sustainable path," that would "regain the trust of [its] stakeholders." Ultimately, Uzzell stated that the Company needed to ***"focus [its] attention and investments in a disciplined manner," to the brands that "have the most promise"***—precisely what Defendants falsely assured investors they had been doing since the beginning of the Class Period.

105. The results again surprised investors. Raymond James analysts noted that the Company's innovation has "fallen behind," and "stumbled in recent years," compared to competitors. In particular, the analysts discussed how Hydro Flask has fallen behind competitors,

as it was "slow to react to consumer preference," and the Company has "lost distribution" in the outdoor sector. Similarly, analysts at Canaccord Genuity noted that the Company has several underlying challenges, including "retailers tightening inventory," and "uncertainty around HELE's longer-term strategy due to a management change." UBS analysts ultimately opined that investors were "still questioning the company's ability to reignite both top- and bottom-line growth."

106. After the announcement, the price of Helen of Troy's common stock declined by $6.90 per share, or 25%, from a closing price of $27.61 on October 8, 2025 to a closing price of $20.71 on October 9, 2025.

* * *

107. Across every major earnings event from early 2024 through mid-2025—six earnings calls, an annual meeting, and an investor conference—Defendants consistently assured the market that the Elevate for Growth reinvestment strategy announced on October 17, 2023 was "on track" and being executed as promised. At each turn, Defendants represented that Pegasus savings were being actively reinvested into the Invest to Grow brands through data-driven, ROI-optimized marketing and innovation spending. Defendants quantified the investment (100+ basis points annually), named the tools being deployed (marketing mix modeling), and pointed to specific brand results (Hydro Flask, Drybar, Osprey) as evidence that the strategy was working, even in the face of significant guidance misses and other negative financial results. And Defendants maintained that their ability to continue executing on these initiatives would prevent the Company from experiencing a goodwill impairment crisis despite a steady decline in the Company's stock price as the truth slowly came out. These consistent and specific representations created and maintained a false impression that the Company's Invest to Grow brands were receiving the disproportionate investment that had been committed at the October 2023 Investor

Day and that reinvestment and revenue guidance were not at risk. As set forth below, these representations were materially false and misleading.

### F. Unknown To Investors, Helen of Troy Lets Its Brands Languish As Defendants Slashed Budgets, Stymied Innovation, and Relationships With Critical Retailers Deteriorated

108. Unknown to investors, and in stark contrast to Defendants' repeated misstatements, Helen of Troy was not reinvesting "fuel" from Project Pegasus into its brands, including the supposed Invest to Grow brands. Nor was the Company leveraging market analytics to allocate resources to product or marketing innovation, prioritize brand-building fundamentals, ensure that its products were competitive, or maintain its brands' relationships with retailers.

109. In reality, Defendants slashed brand budgets across the board during the Class Period. Instead of allocating resources for product and marketing innovation in its brands, the Company provided ***no additional funds*** beyond those allocated in prior periods to any of its Invest to Grow brands (and in some cases allocated *less* money than before) to product and marketing innovation. Further, executives actively discouraged brand efforts to innovate their products. Relationships with key retailers fell apart, with some dropping or significantly reducing Helen of Troy brands from their brick-and-mortar stores during the Class Period. Instead of spending resources to reinvest in brand fundamentals, Helen of Troy wasted millions to move its Beauty brands from beauty industry hotspots (like Los Angeles) to Boston, losing numerous talented employees in the process, and building a new distribution center in Tennessee that experienced building delays and integration issues (and failed to deliver the promised efficiencies).

110. Multiple former employees confirmed that Helen of Troy provided no additional investments to its Invest to Grow brands; that Defendants knew that their investor-facing strategy was not supported by their brands' internal modeling and analytics; that Defendants actively stifled

product and marketing innovation; that the Company's relationships with retailers deteriorated; and that the Company spent money on costly office relocations rather than prioritizing innovation.

111. ***First***, former Helen of Troy employees[4] reported that the Invest to Grow brands—i.e., brands that Defendants promised were being fueled with Project Pegasus savings to drive innovation—in fact received no additional investment from the Company during the Class Period.

112. FE1 was a former employee at the Hydro Flask brand from March 2017 to June 2025, first as a Category Director for Hydration, and then as the Senior Product Category Director. In this role, she oversaw a team of product managers and worked closely with all cross-functional teams to go to market. FE1 confirmed that Hydro Flask was internally classified as an Invest to Grow brand. FE1 explained that the bottle market was fickle and trend-based, and that Hydro Flask faced fierce competition from other bottle brands like Stanley and Owala that damaged Hydro Flask's business based on innovation and strong marketing. FE1 reported that one key area that Hydro Flask needed investment in was marketing given this competitive situation. FE1 recalled that while the Hydro Flask Marketing Department was supposed to get a boost of investment after the October 2023 Investor Day from Project Pegasus, the amount of investment kept dropping by millions in 2024. She knew about these cuts because she had meetings with the Hydro Flask Marketing Department during this period, where marketing employees expressed disappointment at the continuous drops in the promised amount of investment. Ultimately, Hydro Flask never got close to the amount of investment promised after the October 2023 Investor Day.

113. FE2 began working as a Sales Manager in 2022 for Osprey before being promoted to Sales Director in October 2023 for Osprey, Hydro Flask and Curlsmith, where she worked until

[4] Former Employees will be identified herein by number (FE1, FE2, etc.). Regardless of gender, all FEs will be described using feminine pronouns to protect their identities.

leaving the Company in July 2026. As part of her responsibilities, FE2 ran multiple direct-to-consumer departments and reported to the Vice President of Sales for EMEA, and then the Senior Director of Online. FE2 eventually also took over as a Sales Director for Osprey, Hydro Flask and Curlsmith. FE2 confirmed that Osprey, Hydro Flask, OXO, Curlsmith, and Drybar were Invest to Grow brands. But FE2 reported that there was no indication that the Company was putting additional investment into the Invest to Grow brands. For instance, FE2 recalled that Osprey did not receive any marketing reinvestment which she knew because her department worked closely with the Marketing team. In fact, FE2 recalled that the Company had cut back on marketing spend and brand investment in 2022-2023, and then did not reinvest more from 2024-2025. Instead, the Company line was *Do more with less*, which FE2 pinpointed to beginning when Noel Geoffroy took over the Company.

114. ***Second***, former employees confirmed that Defendants knew that their investor-facing strategy was not supported by the Company's internal modeling and analytics, and that what Defendants told the market was significantly inflated compared to internal Company guidance.

115. FE3 was a former Senior Finance Analyst and then Finance Manager at Helen of Troy from January 2020 to July 2024, where she was responsible for working through financial reporting, executive deck preparation, budget building, forecast maintenance and all the reporting for Helen of Troy's beauty brands, and eventually for the entire brand portfolio for North America. FE3 reported to Matt Dunn, the Senior Vice President of Finance of the North America (Division CFO), who, according to FE3 reported directly to Defendant Grass. FE3 explained that Dunn would frequently attend meetings with Defendants Geoffroy and Grass and would relay what happened at those meetings to FE3, and that FE3 personally attended some meetings with either Geoffroy or Grass. FE3 recalls that in meetings attended by Geoffroy and Grass, Dunn would be

informed of what Defendants and other executive leadership wanted to do strategy-wise, and in response, Dunn would tell Defendants and executive leadership that there was no support for such sales targets in the Company's internal analytics and that the given segment would not be able to support those sales. But Defendants and the executive leadership team would decide to move forward with their strategy anyway; despite the data, they would double down. FE3 recalled that since 2023, the budget was not close to what was proposed by the brand owners. FE3 recalls that it was specifically Defendants Grass and Geoffroy who would push back on Dunn when he would recommend a strategy that was consistent with their brands' internal analytics.

116. FE3 explained that typically, a company wants its external goals to be more conservative than their internal goals, but from 2023 through the end of FE3's tenure, Helen of Troy's external goals were inflated compared to what the Company internally acknowledged could be achieved. FE3 reported being "flabbergasted" by Geoffroy and her team's disregard for realistic data and stated that there was a 15%-20% overinflation discrepancy between the brand's actual data and Defendants' reports to the market.

117. According to FE3, the brands prepared in-depth budgets, taking account of sales targets and marketing and operating costs, but executives then inflated these goals by 15%-20%, despite pushback from the brands and employees like Dunn. FE3 knew this occurred because Dunn told her, and because she had direct access to the brands' original presentations, often assisting in the preparation of such materials, and to the Company's final numbers. Based on this information, FE3 directly calculated the discrepancy between the brands' proposals and management's higher final numbers.

118. ***Third***, former employees confirmed that Defendants actively stifled product and marketing innovation.

119. FE4 was the Director of Global Product Innovation from September 2018 to March 2025, where she focused primarily on Honeywell, Braun, PUR and Vicks brands at Helen of Troy. There, she was responsible for designing new products and updating the designs of existing products, and reported to the Vice President of Innovation and Design, who reported to CEO Geoffroy. FE4 attributed the long-term structural issues at the Company, at least in part, to losing focus on design. FE4 explained that the Company grew to what it was because of its innovative products and issues arose when it stopped innovating.

120. FE4 recalls that under ex-CEO Julien Mininberg's leadership, these brands were product-driven, and the Company was interested in and encouraged innovation in their products. But after Defendant Geoffroy took over in March of 2024, the Company de-prioritized innovation. FE4, whose boss reported directly to Geoffroy, recalled that at that time, her innovation team's design proposals were often rejected in favor of minimal branding changes. For this reason, FE4 explained that Helen of Troy's brands were "getting killed" by competitors that actually invested in design.

121. FE4 gave an example of a situation in which an innovative design idea was rejected by the Company. In 2024, Braun demanded that Helen of Troy sell more of its licensed products. As a result, FE4 developed a pen-like handheld thermometer and presented it to Braun's Head of Design in a meeting in Germany. The Head of Design told FE4 that they liked the design, but Helen of Troy scrapped the idea because the marketing team thought that removing the bend at the tip of the thermometer was risky.

122. FE5 worked from June 2025 to November 2025 as a Brand Marketing Assistant for Honeywell. As part of this role, she worked with the Director of Marketing on marketing campaigns, analytics, and corresponding with manufacturers, producers and engineers regarding

the development of new products. FE5 confirms that rather than innovating, the Company dictated the use of cheaper materials and cut corners on manufacturing to save money. Specifically, FE5 recalls that a Honeywell fan was originally designed with nubs on the bottom of the base of the fan to keep the fan from sliding. After taking part in product reviews for a re-design of the fan, FE5 noticed that the nubs had been removed. When FE5 asked a Project Manager about the missing nubs, the Project Manager admitted that she had the same question, and that the Company implemented the change to save money. Thus, the Company was removing features of existing products to save money, not innovating on its product line.

123. Other former employees corroborated that Helen of Troy de-prioritized and stifled innovation across its brand portfolio. For example, FE2 stated that beauty brands like Drybar and Revlon had not had innovation in quite some time. Likewise, FE6[5] noted that the Company was developing a new "Air Straightener" for Revlon, but the product flopped because the Company was constantly cutting corners and unwilling to invest in the product. FE6 explained that when the Air Straightener was released, it was quickly outcompeted by Dyson, which came out with its own similar device shortly thereafter. FE6 also noted that while the Company touted Drybar's "Hot Rollers" as a "key example of innovation," it had not innovated on the product at all, but in fact had just bought the product as-is from a manufacturer in China and put Drybar's packaging on it.

124. ***Fourth***, former employees confirmed that Helen of Troy's retailer relationships suffered during the Class Period due to the lack of reinvestment and innovation. For example, a former employee confirmed that Sephora pulled Drybar products from its brick and mortar stores

[5] FE6 worked at Helen of Troy from April 2021 to October 2024 as a Design and Innovation Manager for Beauty, focusing on Revlon, Hot Tools, Curlsmith, and eventually Drybar after Drybar's office transitioned out of Irvine, California. In her role, she and her team designed new products and refined existing ones, working with the Marketing, Product, and Engineering teams. FE6 reported to the Director of Design and Innovation.

after ten years of carrying them precisely because Helen of Troy did not reinvest resources into the brand for innovation.

125. FE7 worked as Vice President of Sales for Helen of Troy's Prestige Beauty Division, handling brands like Drybar, Revlon and Curlsmith from 2020 until January 2024. From 2016 to 2020, she worked as Vice President for Commercial for Drybar before Helen of Troy acquired the brand. In her role at Helen of Troy, she had quarterly meetings with the C-suite, including Defendant Geoffroy, and spoke weekly with the CEO of Beauty and the Senior Vice President of Finance. As Vice President of Sales, FE7 oversaw sales to all retailers in several countries, including the U.S. and Canada, for those brands. FE7 explained that Drybar originally told Sephora in 2023 that it would spend $1 million in marketing with Sephora in 2024. Then, in late 2023 Helen of Troy told Drybar that it did not have the budget for that and could only spend approximately $350,000 on marketing with Sephora that year. FE7 was responsible for relaying this significant marketing budget cut to Sephora. As a result, FE7 explained, Sephora told the Company in November 2023 that it was going to drop Drybar from its brick-and-mortar locations, and Drybar products were gone from Sephora's in-store shelves by February 2024. She concluded that Sephora stopped investing in Helen of Troy because the Company was not investing in them. This was a big hit to the Company. Sephora's Drybar sales constituted $30 million overall, with approximately 60% of that from approximately 800 brick-and-mortar locations, including in department stores like Kohl's. It was particularly unfortunate given that before Sephora pulled their products, Drybar had been up 8%-9% in sales revenue in brick-and-mortar locations, while its eCommerce sales on Sephora were down almost 18%-19% in revenue. According to FE7, the Company "killed Drybar."

126. The deterioration of Helen of Troy brands' relationships with their retailers was not limited to just Drybar's exit from Sephora. FE7, who still works in the beauty retail industry, explained that retailers have told her that they have scaled back their Helen of Troy business considerably since the time that she left the Company. She also reported that while Ulta still carries Drybar products, she recalls that the brand used to have a six-foot linear in Ulta, and believes they are now down to a three-foot linear.

127. FE5 reported that Honeywell's relationship with several retailers deteriorated drastically in 2025, and that it was bleeding the brand money to even buy the shelf space to put product in stores. In planning meetings, FE5 would hear that vendors had about 20,000 to 40,000 units of backstock sitting in stores, and that the products had to be discounted at massive rates. Specifically, FE5 reported that Target, Best Buy, and Walmart all had significant backstock of Honeywell products. FE5 explained that Helen of Troy was responsible for paying for the markdowns the retailers applied, giving the stores their money back if the stores had to discount the items to clear out the backstock. FE5 would participate in biweekly planning meetings with forecasters, who relayed their discussions with retailers expressing that Honeywell was getting beaten by competitors and even the retailers' private label brands, and that Honeywell was failing to sell because it was not innovating to keep up with competitors.

128. Honeywell's problems with retailers were not limited to brick-and-mortar shops: FE5 also reported that Honeywell's products stopped selling on Amazon, as Amazon started heavily discounting Honeywell's items and promoting third-party sellers that were selling Honeywell product but not promoting Honeywell. Honeywell was losing business to third-party resellers who were selling its products, and thus Helen of Troy had to compete with both competitors with more innovative products and third-party resellers.

129. FE5 reported that there were biweekly meetings for planning of all the home goods brands where these issues were discussed, and that there were a lot of email threads after such meetings that would loop in senior management, which included the Vice President of Marketing for the Wellness brands. Some such emails were from the finance team giving a weekly report of where the business was. The finance team would also meet with the brands walking them through the business's performance and detailing a significant decline in revenue.

130. ***Fifth***, former employees recalled that money that should have been reinvested in the brands was instead spent on the relocation of the Beauty brands to Boston, which stifled innovation. For example, FE7 reported that Defendant Geoffroy insisted on moving Drybar from its existing offices just outside of Los Angeles, California (a hotspot for the Beauty industry) to a new office in Boston, where Helen of Troy's beauty brands would be consolidated. FE7 recalled that the Company lost approximately 31 long-time Drybar and Revlon employees because of the move, and that the move made no sense given that Beauty industry participants did not live in Boston; they were based in either New York or Los Angeles. FE2 confirmed that the move to Boston resulted in a massive exodus of employees and was a massive mistake.

131. Meanwhile, while Helen of Troy forced the Beauty brand employees to relocate to Boston, FE8[6] explained that the Company leased a new building in downtown Manhattan for just the six C-suite members of the Company, including Geoffroy and Grass, despite the Company already having offices in Manhattan and just across the river in New Jersey. At the same time, employees were being denied the bonuses and raises they had been previously promised.

---

[6] FE8 worked at Helen of Troy from January 2024 until October 2025, originally as an Engineering Project Manager and later an Operational Program Manager. In both roles, she was responsible for managing timelines and budgets for new product development primarily for PUR, and briefly for Braun. She reported to the Senior Managing Director at Helen of Troy, and then later the Director of Americas Sourcing.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

132. Defendants made numerous materially false and misleading statements during the Class Period in violation of Sections 10(b) and 20(a) Exchange Act and Rule 10b-5 promulgated thereunder. Among other things, Defendants misled investors that Helen of Troy was actively reinvesting savings from Project Pegasus to "fuel" product and marketing innovation in its brands; that its savings and reinvestment efforts were "on track"; that Helen of Troy would meet its revenue guidance; that its brands were actively innovating new products, spending additional marketing funds, and using advanced marketing analytics; that Helen of Troy's relationships with its retailers were a "tailwind" and that the Company continued to improve those relationships to enhance distribution of its products; and that reducing marketing and innovation spend would be "one of the last levers" the Company would pull even in an increasingly challenging competitive environment.

### A. False and Misleading Statements On October 17, 2023

133. On October 17, 2023, Helen of Troy held its Analyst and Investor Day Conference.

134. In announcing the Elevate for Growth strategy, Defendant Geoffroy emphasized that the Company was actively leveraging Project Pegasus savings for reinvestment into its key brands:

> Zooming out, this portfolio prioritization is particularly critical right now as we look to reinvest back in the business. ***We're leveraging the incremental fuel generated by Project Pegasus with the brand portfolio classification*** to enable us to focus our investment on the most attractive opportunities. This allows that incremental funding to have a double benefit, more funding, but also more focused on the best opportunities and even further enabled with new ROI analytic capabilities.

135. Furthermore, when an analyst posed a question to Defendants about long-term growth, Defendant Grass emphasized that the Company had "teed up" Project Pegasus savings for reinvestment:

> I hope it came across the Project Pegasus, ***the scale of what we've already kind of teed up for fiscal 2025 and 2026, which is largely gross profit based, is significant to drive much more incremental than what we've done through fiscal 2024.***

136. The statements set forth above in ¶¶ 134-35 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unbeknownst to investors at the time, Defendants were not "***leveraging the incremental fuel generated by Project Pegasus***" to prioritize brand-building, and they had not "***teed up***" savings for reinvestment. In fact, at the time of these statements, Defendants were knowingly slashing brand budgets across the board, providing no additional, or less, money to product and marketing innovation, and actively discouraging brands' efforts to innovate. Key customer relationships needed to drive the growth of the brands the Company would supposedly reinvest in were falling apart, with large retailers like Sephora threatening to drop Helen of Troy's flagship brands from their brick-and-mortar locations. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a distribution center with a myriad of implementation problems. And Defendants ignored internal brand data that contradicted Defendants' claims to investors regarding sales growth in their brands.

**B. False and Misleading Statements On January 8, 2024**

137. On January 8, 2024, the Company held its earnings call for the third quarter of fiscal year 2024. During this call, analysts asked Geoffroy for an "update on Project Pegasus." In response, Defendant Geoffroy stated that the Company was "***on track***" with its savings initiatives. She further explained that the money from the project would "become[] the fuel that we can use to reinvest back in the business leveraging the new portfolio classification that we laid out, Invest

to Grow, Stronghold and optimize. So we really get a double benefit there, right? ***We're able to invest the incremental fuel, but we're also doing it in a more focused way*** . . . the opportunities that we think are most appeal[ing] and best ROI is attractive."

138. On that same call, Defendant Grass affirmed that the Company was on track, and he linked Helen of Troy's guidance to Project Pegasus, stating,

> ***We continue to expect Pegasus to provide the fuel and operational improvements that allow us to achieve the objectives we outlined in our Investor Day which are average annual growth rates of 3% to 4% for net sales, 30 to 40 basis points of adjusted EBITDA margin expansion and at least 10% adjusted EPS growth.***

139. The statements set forth above in ¶¶ 137-38 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, Defendants were not "***on track***" with "***invest[ing]***" the "***fuel***" from Project Pegasus into its supposed Invest to Grow brands. Nor was there any basis to state that Project Pegasus was providing the fuel to support growth rates of 3%-4% or the other metrics as set out during the Company's October 2023 Investor Day. Instead, Defendants were knowingly slashing brand budgets across the board, and providing no meaningful additional resources to product and marketing innovation. Relationships with its key customers needed to "drive the growth" of the brands in which the Company would supposedly reinvest were falling apart, with large retailers like Sephora threatening to drop Helen of Troy's flagship brands from their brick-and-mortar locations. Indeed, rather than reinvesting in its brands, Helen of Troy had been pouring money into the Iron Giant Tennessee distribution center project, but difficulties in opening the new distribution center were common knowledge to employees, and no actual progress had been made on the project until mid-2024. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a distribution center with a myriad of implementation problems. And Defendants ignored internal

brand data that contradicted Defendants' claims to investors regarding sales growth in their brands. For these reasons, it was misleading to provide guidance to investors of "***average annual growth rates of 3% to 4% for net sales***," "***and at least 10% adjusted EPS growth***" when the attributed basis for that growth, fuel from Project Pegasus, was not in fact being reinvested into the Company's Invest to Grow brands.

**C. False and Misleading Statements On April 24, 2024**

140. On April 24, 2024, Helen of Troy published its earnings release for the fourth quarter of fiscal year 2024, and initiated the Company's Fiscal 2025 outlook. In a press release published that day, the Company guided that for fiscal year 2025, it expected to achieve: "***Consolidated Net Sales of $1.965-$2.025 Billion***," "***Adjusted Diluted EPS of $8.70-$9.20***," and "***Adjusted EBITDA of $324-$331 Million***."

141. The Company held its earnings call for the fourth quarter of fiscal year 2024 on April 24, 2024. During this call, Defendant Grass discussed the Company's expected decline in adjusted EBITDA. Grass assured investors that the "adjusted EBITDA margins [] decline[d] roughly 40 basis points ***as benefits from Pegasus and other gross profit improvements are reinvested for growth***."

142. During the conversation, analysts asked Geoffroy to "provide additional color on the building blocks to drive the improvement in revenue," and what would be "driving retailers to increase [the Company's] distribution if the macros are not in favor?" In her response, Defendant Geoffroy highlighted some of the "new innovation" in the brands' product lines, pointing to Drybar's "Hot Roller Club" as one of the Company's "***newest innovations***."

143. During this call, Defendant Geoffroy also provided an update on the purported savings from Project Pegasus to investors:

> [W]e ***are generating fuel from Project Pegasus*** to incrementally invest in growth opportunities and capabilities. This will enable us to strategically invest in our brands with precision marketing and further product and commercial innovation. [W]e are advantageously positioned to fully leverage our operational and organization scale and assets.

144. Defendant Grass also linked the Company's fiscal year guidance to its reinvestment strategy:

> ***With the fuel from Pegasus, the operational improvements we've made and our Elevate for Growth strategies; we believe we are well positioned*** to navigate what we expect will be a softer consumer spending environment. ***We expect net sales between $1.965 billion and $2.025 billion in fiscal 2025, which implies a decline of 2% to growth of 1%.***

145. The statements set forth above in ¶¶ 140-44 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, Defendants were not "***reinvest[ing]***" "***benefits***" from Project Pegasus savings into the "***growth***" of its Invest to Grow brands or any Elevate for Growth "***operational improvements***." In fact, Defendants were knowingly slashing brand budgets across the board, and providing minimal funding to product innovation. Indeed, Drybar's Hot Rollers were not a Helen of Troy "***innovation***" at all; former employees reported that the product was engineered entirely by a third-party manufacturer in China, which Helen of Troy bought "off-the-shelf" and put Drybar's name on it. Instead of reinvesting in its brands, Helen of Troy had been pouring money into the Iron Giant Tennessee distribution center project, but difficulties in opening the new distribution center were common knowledge to employees, and no actual progress had been made on the project until mid-2024. In addition, relationships with key retailers were falling apart, including with Sephora, one of Drybar's largest retailers, which followed through on its threats to drop Drybar's products from brick-and-mortar locations entirely. And Defendants ignored internal brand data that contradicted Defendants' claims to investors regarding sales growth in its brands. For these reasons, it was also misleading to provide guidance to investors regarding its "annual

sales" when the attributed basis for that growth, "***fuel from Pegasus***," was not in fact being reinvested into the Company's Invest to Grow brands.

146. Defendants also knew by that point that the assumptions underlying their guidance, which included sales growth particularly in its Invest to Grow brands as a result of significant reinvestment of Project Pegasus savings, were not based on reliable or realistic internal data, and were not supported by any product or marketing innovation. Because the Company relied on the same guidance to conduct its impairment testing, Defendants knew, or were at least severely reckless, in not engaging in a quantitative analysis of the Company's impairment risk even though circumstances warranted such a review.

**D. False and Misleading Statements On July 9, 2024**

147. On July 9, 2024, the Company hosted a call with investors regarding the earnings of the first quarter of fiscal year 2025. Defendant Grass provided an update on Project Pegasus, stating that the Company was "maintaining the cost savings, cadence and restructuring cost estimates," that they had shared in the previous quarter's earnings call.

148. Defendant Geoffroy emphasized that "[t]he savings generated from [Project Pegasus] ***are being reinvested back into our brands***." Further, she claimed, the Company was already taking action to address this underinvestment "by prioritizing strong brand-building fundamentals and ***continuing to increase our marketing and innovation spend***."

149. In describing Helen of Troy's strategy over the past year, Defendant Geoffroy stated,

> Beginning in fiscal 2024, ***we refocused on the health of our brands and invested in elevating our brand-building fundamentals by developing and implementing a Helen of Troy brand-building framework across our entire marketing organization***. This entailed a ***rigorous approach to quantitatively define and segment the market***, selecting who we are serving and clarifying what our brands stand for. ***All our marketing content, activation and innovation will be grounded in these revitalized, data-centric brand strategies***.

150. In response to an analyst's questions about the "long-term strategy," of the Company and what they were "learning, both internally and externally right now," Defendant Geoffroy said,

> I've gotten the marketing mix modeling data and ***seen fairly positive ROIs across our portfolio***, across the tactics with opportunity to optimize with opportunity to continue to invest smarter and strategically, that only bolsters my confidence that that's the right path forward for us. We've got to ***get our core brands growing consistently***, ***and the data actually shows that that will work with the right continued fueling and the right kind of brand fundamentals in place.***

151. The statements set forth above in ¶¶ 147-50 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, supposed savings were not "***being reinvested back into [Helen of Troy's] brands***," nor were Defendants leveraging a "***rigorous approach to quantitatively define and segment the market***." In fact, Defendants were knowingly slashing brand budgets across the board, and providing no additional or less money to product and marketing innovation. Nor did Helen of Troy's "***data actually show[]***" that Defendants' efforts would result in its "***core brands growing consistently***." Indeed, as former employees noted, Defendants were regularly provided with accurate data from Helen of Troy's brands demonstrating substantially slower (if any) sales or revenue growth, and were told that the Company's guidance was unrealistic—but Defendants consistently ignored such data and warnings, and went ahead with their guidance anyway. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a distribution center with a myriad of implementation problems.

### E. False and Misleading Statement On August 21, 2024

152. On August 21, 2024, Helen of Troy held its Annual General Meeting with investors. In her opening remarks, Defendant Geoffroy discussed Project Pegasus, stating that the Company

"remain[s] ***on track to achieve those savings*** which will provide fuel to drive our value creation flywheel."

153. At the meeting, an analyst asked whether "Helen of Troy [was] going to be able to return to growth with its current portfolio of brands." Defendant Geoffroy responded by reiterating that the Company "continue[s] to hold strong positions," in its brands' "respective categories." In discussing the Company's strategy, she stated "We are investing in strengthening our brand building fundamentals. ***We have significantly increased our growth investment to fuel both marketing and product innovation***, and ***we are increasing our distribution footprint. . .*** We are already seeing market share improvement, telling us that we are ***moving in the right direction***."

154. The statements set forth above in ¶¶152-53 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, Defendants were not "on track to achieve those savings" from Project Pegasus to "fuel both marketing and product innovation" into its supposed Invest to Grow brands. In fact, Defendants were knowingly slashing brand budgets across the board, providing no additional or less money to product and marketing innovation, and actively discouraging brands' efforts to innovate. In addition, relationships with key retailers were falling apart, with Sephora and Ulta dropping or significantly reducing them from its brick-and-mortar locations. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a distribution center with a myriad of implementation problems. And Defendants ignored internal brand data that contradicted Defendants' claims to investors regarding sales growth in their brands.

### F. False and Misleading Statement On October 9, 2024

155. On October 9, 2024, the Company held its second quarter earnings call for fiscal year 2025. When discussing Project Pegasus, Defendant Geoffroy told analysts that it "***continues to be on track and is generating critical fuel for reinvestment in our brands***."

156. During the call, analysts asked about the Company's Beauty brands, as "clearly it's gotten more competitive out there," and asked what the "key efforts to drive that category back to growth" were. Defendant Geoffroy minimized these concerns, emphasizing that "[w]e've got some more innovation in the pipeline," and outlined the Company's alleged plan for new product rollout, stating "[T]hose are going to be the steps, right. It's the marketing. It's the new products. ***It's positioning our brands in the marketplace with our retail partners effectively***."

157. The statements set forth above in ¶¶ 155-56 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, Defendants were not "on track" reinvesting the "fuel" from Project Pegasus into its supposed Invest to Grow brands, nor were they "positioning our brands in the marketplace with [their] retail partners effectively." In fact, Defendants were knowingly slashing brand budgets across the board, providing no additional or less money to product and marketing innovation, and actively discouraging brands' efforts to innovate. In addition, relationships with key retailers were falling apart. For example, former employees reported that Sephora and Ulta, key retailers for Drybar, pulled or significantly reduced the brand's products from their hundreds of brick-and-mortar locations. And even online, Amazon was pulling Honeywell products from its first search page, heavily discounting the brand's items, and promoting third-party resellers. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a distribution center with a myriad of implementation problems.

### G. False and Misleading Statements On January 8, 2025

158. On January 8, 2025, Helen of Troy held its third quarter earnings call for fiscal year 2025 with investors and analysts. In her opening statements, Defendant Geoffroy again affirmed that Project Pegasus was "***on track*** . . . providing ***critical fuel for reinvestment*** in our brands and business," and the Company "***continue[s] to use our marketing mix modeling data to prioritize investment opportunities*** across our brand portfolio and also to select the marketing tactics where we see the best ROI potential. These efforts contributed to market share growth in multiple categories with seven of our key categories growing or maintaining share this fiscal year through November."

159. Defendant Geoffroy further outlined that one of the Company's "key strategies" was to "***be and win where the shopper shops***." Specifically, she noted that:

> If you're not in a retailer where the [brand] category is quite developed, that's a gap. And so that's been a real focus for us in the North American RMO [regional market office] to close those gaps . . . . So, I think that's a real positive and will continue to be a tailwind. It's our responsibility to continue to bring the right assortment, the right promotions, the right programming so that the velocities perform once we're in those retailers.

160. Defendant Geoffroy also reiterated the Company's guidance regarding Elevate for Growth. When an analyst asked her whether the targets Defendants had outlined at the October 2023 Investor Day were "still achievable at this point in time?" Defendant Geoffroy responded affirmatively, stating that "***[w]e haven't revised them***."

161. The statements set forth above in ¶¶ 158-60 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, Defendants were not "***on track***" with "***reinvest[ing]***" the "***fuel***" from Project Pegasus into its supposed Invest to Grow brands, nor leveraging marketing analytics to "***prioritize***" brand-building. And it was misleading for Defendant Geoffroy to assert that Defendants' long-

term targets were still achievable, when in fact, throughout the class period until this point, Defendants were knowingly slashing brand budgets across the board, providing no additional or less money to product and marketing innovation, and actively discouraging brands' efforts to innovate; the opposite of the Elevate for Growth strategy that they had repeatedly tied their guidance to since their October 2023 Investor Day.

162. Nor was the Company "***clos[ing] the gaps***" with retailers to "***be and win where the shopper shops***," but rather the opposite; it was letting relationships with key retailers crumble, with some, like Sephora and Ulta, dropping or significantly reducing them from their brick-and-mortar locations wholesale, Walmart refusing to buy any more inventory until it sold Helen of Troy backstock, and Amazon heavily discounting Helen of Troy products online while promoting third-party sellers.

163. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a Tennessee distribution center with a myriad of implementation problems. And Defendants ignored internal data on marketing analytics that contradicted Defendants' claims to investors regarding sales growth in their brands.

**H. False and Misleading Statement On January 13, 2025**

164. On January 13, 2025, at the annual ICR Conference, Helen of Troy spoke with investors and analysts. In her opening remarks, Defendant Geoffroy provided an update on Project Pegasus:

> [I]f you look at Helen of Troy, you might hear about Project Pegasus. This was a global restructuring program that we put in place in 2022. It was both to make us more effective and efficient, but importantly to generate fuel to reinvest back in the brands. ***And that's one of the most important things that I've been really looking to do since I joined the company is get our investment in our brands for both marketing and innovation to a much higher level than what we've had in the past. And we've been successful in doing that***, as well as putting in data and analytics,

> so that when we're making that investment, ***we have a much better understanding with data and analytics of where the ROI is, what's working, what's not working, so that we can shift accordingly***.

165. Further, Defendant Geoffroy renewed earlier statements about the project's status, stating that it continued to be "***on track***," and that the Company was "***seeing the fruits of [the project's cost] labor now***."

166. The statements set forth in ¶¶ 164-65 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, Defendants were not "***successful***" in "***get[ting] [their] investment in [their] brands for both marketing and innovation to a much higher level***" than what they had in the past. Nor was the Company "***on track***" with reinvesting the "***fruits***" from Project Pegasus into its supposed Invest to Grow brands. In fact, Defendants were knowingly slashing brand budgets across the board, providing no additional or less money to product and marketing innovation, and actively discouraging brands' efforts to innovate. In addition, relationships with key retailers were falling apart, with some dropping or significantly reducing them from their brick-and-mortar locations. They were refusing to "***shift***" the Company's guidance "***accordingly***" to the internal data-driven sales expectations from its brands, contradicting claims to investors regarding sales growth. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a Tennessee distribution center with a myriad of implementation problems.

### I. False and Misleading Statement On April 24, 2025

167. On April 24, 2025, Helen of Troy hosted a call with investors to discuss its fourth quarter of fiscal year 2025 earnings. During the call, analysts asked for more color on how the Company was mitigating costs. Defendant Geoffroy reiterated that while the Company was "working to pull all the levers" regarding mitigation, she noted,

> ***[A]ll of you have heard me talk about the importance of investing in our brands, and we've increased that investment by 40% over the last three years from a growth investment standpoint.*** It continues to be a critical part of how we'll go forward in our long-term health. ***And so, reducing any marketing or innovation expense will be one of the last levers I want to pull. And . . . if we get to a point that we need to do that, we will leverage all of the new marketing mix capability that we've built to optimize that investment in areas where we've got the highest ROI***.

168. The Company also represented to investors in its fiscal year 2025 10-K that the Company could avoid further impairment charges (beyond the $51.5 million impairment charge disclosed concerning the Invest to Grow Drybar brand announced the same day) by continuing "***the execution of our Elevate for Growth Strategy***, which includes investing in our brands, growing internationally, new product introductions and expanded distribution to drive revenue growth and profitability and achieve our projections."

169. The statements set forth above in ¶¶ 167-68 were materially false or misleading, and omitted facts necessary to make them not materially false and misleading. Unknown to investors at the time, reducing marketing or innovation expense was not "***one of the last levers***" Defendants would pull in the future. Instead, Defendants had ***already*** been knowingly slashing brand budgets across the board, providing no additional or less money to product and marketing innovation and actively discouraging brands' efforts to innovate. And Defendants were not using the purported "***marketing mix capability***" they had "***built***" to "***optimize***" investment into its Invest to Grow brands. Instead, the Company was spending its money on efforts like expensive moves of their Beauty brands from Los Angeles, a hotspot for the industry, to Boston and a distribution center with a myriad of implementation problems.

170. Furthermore, Defendants falsely suggested in the Company's fiscal year 2025 10-K that further impairment charges were avoidable through execution of the Elevate for Growth initiative when, in reality, Defendants had not been reinvesting, and had no near-term plans to

reinvest, Project Pegasus savings in its brands to drive product and marketing innovation. Essentially, Defendants posed Elevate for Growth's success as a hypothetical when, in actuality, the initiative had already failed.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

171. The following additional facts support a strong inference that Defendants knew, or at minimum were severely reckless in not knowing, that Helen of Troy was not reinvesting savings into its brands to prioritize product and marketing innovation, and that Helen of Troy's internal data analytics did not support the sales growth Defendants promised of its brands.

### A. Defendants Held Themselves Out as Knowledgeable of the Facts Underlying the Fraud

172. Defendants Geoffroy and Grass held themselves out as knowledgeable about Project Pegasus and Elevate for Growth, including that the Company was "on track" in investing any savings from Project Pegasus into the Invest to Grow brands and that the Company was undertaking successful marketing and innovation efforts to grow the brands. As detailed above, Defendants spoke regularly to investors and securities analysts about these topics, professing to know what they were speaking about.

173. Defendant Geoffroy was the CEO of Helen of Troy and Defendant Grass was its CFO and later Interim CEO. Each Defendant was intimately involved in Helen of Troy's overall performance.

174. The fact that Defendants held themselves out as knowledgeable about the subjects covered by the alleged misstatements and discussed these subjects in detail with investors and securities analysts, including numerous contemporaneous statements that the Company was "on track" and actually reinvesting in the businesses, supports a strong inference of their scienter.

175. Given all these statements, either Defendants knew the representations they provided about Helen of Troy's purported investment and innovation were false and misleading or, at minimum, they were severely reckless in not finding out the truth.

### B. Geoffroy Touted Her Personal Involvement and Oversight of Project Pegasus and Elevate for Growth

176. Defendant Geoffroy repeatedly touted Project Pegasus and Elevate for Growth as her own initiatives and detailed her specific contributions to the Company's supposed focus on innovation. In fact, throughout the Class Period, Defendant Geoffroy personally and repeatedly emphasized not only that she knew about the progress of Project Pegasus and Elevate for Growth, but that they were initiatives that she was personally supervising.

177. For example, after a "virtual fireside chat" with the Company and several of its executives (including Defendants Grass and Geoffroy), an analyst from Raymond James noted on April 30, 2023 that "***Geoffroy has spearheaded*** the Pegasus restructuring program" and further reported that "***Geoffroy has also emphasized*** the importance of the company's reorganization . . . and improved approach to innovation and distribution." At the Company's October 17, 2023 Investor Day, Defendant Geoffroy further expanded on her supposed plans to improve Helen of Troy's approach, introduced the Elevate for Growth strategy as a plan that she developed and would personally execute, and presented a slide entitled "***Why I Am Excited About the Future of Helen of Troy***." Geoffroy stated that the Company would use Project Pegasus savings to "supercharge organic revenue growth in a way we haven't been able to before," and explained that this reinvestment was "a big moment for our brands." Geoffroy also announced that "I've . . . added a new member to the global leadership team"—a Global Chief Marketing Officer—to drive the Company's supposedly enhanced focus on consumer obsession and brand building.

178. On the Company's January 8, 2024 earnings call, Defendant Geoffroy emphasized that "our Pegasus initiatives remain on track" and touted the Company's progress under her leadership, stating that the Company's performance "is a solid outcome in what continues to be a challenging macro consumer environment and is a testament to the initiatives we have chosen." Geoffroy took personal credit for these initiatives, stating, "[O]ne of the things that I'm most excited about" was the changes from Project Pegasus, and describing how "one of the biggest choices that we made as part of Pegasus" was the North American regional market organization. Geoffroy explained that "all of those aspects are what bring the confidence that Brian [Grass] and I have on what we shared at the Investor Day and kind of year one of Elevate for Growth in fiscal '25."

179. On the Company's April 24, 2024 earnings call, Defendant Geoffroy continued to emphasize her personal commitment to the purported reinvestment strategy, stating; "[A]s we looked at our brands and the need to be top of mind aware – build top of mind awareness, be available where our key shoppers are shopping. We needed to put some investment." Geoffroy explained that this increased brand investment was a deliberate strategic choice that she personally made.

180. At the Company's August 21, 2024 Annual General Meeting, Defendant Geoffroy again took personal credit for the Company's purported strategic initiatives. Geoffroy stated, "For those of you who don't know my background, I have spent my career at consumer focused companies such as P&G, H.J. Haines [sic], Kellogg, and Sanofi Consumer Healthcare. At these companies, I gained a deep understanding and appreciation for consumer obsession and ***data driven brand building***." Geoffroy emphasized that "I've discussed many changes that have been made since I joined Helen of Troy as Chief Operating Officer in 2022," and boasted that "if I had

to pick one that I believe will have the most significant impact on our company, it would be embracing next level data and analytics."

181. That Geoffroy repeatedly took personal credit for the failed strategic initiatives at the heart of Defendants' fraud further supports an inference of scienter.

### C. Defendants Had Personal Knowledge Contradicting Their Public Statements

182. Defendants made statements about Helen of Troy's reinvestment strategy and execution that they knew were false, or that they were severely reckless in not knowing were false. This Complaint includes the accounts of eight (8) former Helen of Troy employees, many of whom during the Class Period had roles within or overseeing the very brands in which Helen of Troy claimed it was reinvesting to drive innovation. Those former employees consistently reported that Defendants actually knew (or had access to the same information) that (i) the Company allocated no appreciable reinvestment of Project Pegasus savings to the brands; (ii) the Company allocated no additional resources to those brands for marketing purposes, and even ***reduced*** such resources during the Class Period (resulting in lackluster product launches and the severe deterioration of the brands' relationships with retailers); and (iii) the Company actively discouraged product innovation, instead choosing to cut costs in updates to existing product designs or license existing off-the-shelf products from overseas manufacturers. *See, e.g.*, ¶¶ 112-13, 119-29.

183. Former employees also consistently recall internal confusion and frustration with the Company's investor-facing guidance, as that guidance was divorced entirely from the historical and realistic future performance of the brands given the lack of available resources. *See, e.g.*, ¶¶ 114-17. For example, FE7, a former VP of Sales for the Company's Prestige Beauty division from 2020 to 2024 who was personally involved in the financials of all of the Company's Beauty segment and who reported meeting separately with Geoffroy and Grass, reported that the Company kept extending its guidance each quarter, and when those quarters ultimately missed that guidance,

the Company kept acting like it would get better in the next quarter. The Company would claim they were launching products to infuse the business with new growth, but as FE7 pointed out, if there was no marketing investment, how would anyone even know about these launches?

184. One former employee, FE3, who also worked on brand-level presentations presented to Company leadership (including Defendants Geoffroy and Grass), stated that the brand-level presentations were analytical and grounded in actual internal data but reflected significantly smaller revenue goals and sales projections.

185. Defendants and other executives, however, ***never incorporated those brands' actual data-driven internal guidance into Defendants' company-wide projections***, and those projections were thus ***routinely 15-20% inflated*** compared to the brands' internal metrics.

186. Specifically, FE3, formerly a Senior Finance Analyst and then a Finance Manager at Helen of Troy from 2020 to 2024, confirmed that she and the Division CFO, Matt Dunn, repeatedly told the executives, including Defendants Geoffroy and Grass, that internal budget data regarding revenue goals, sales per month by brand, and operating expense limits that would be set as part of the annual budget cycle, was unrealistic and unsupportable by the data. FE3 stated that there was a lack of willingness to base strategy decisions on tangible data. When FE3 and Dunn would tell Helen of Troy leadership including Geoffroy and Grass that there was no support for Defendants' strategic initiatives in the analytics, Defendants and the leadership team would decide to move forward with their strategy anyway; despite the data, they would double down. FE3 described how, ***from 2023 to mid-2024, executives would regularly inflate the proposed brand-level budgets by 15%-20%***, ascribing unrealistic goals of what a brand could accomplish in terms of sales, marketing and operating costs. FE3 saw these projections on PowerPoint slides that had been presented in internal meetings and was able to directly see the difference between the brands'

well-informed targets and management's estimates, which added this additional 15%-20% on the top line, flowing to high teens/low twenties on EBITDA. FE3 knew these original metrics were being communicated to Defendants from her discussions with Dunn, who was in the room with brands and Defendants Geoffroy and Grass, during these conversations. Furthermore, FE3 was able to go into internal company systems and access each iteration of brand budgets before and after management changes and could calculate the discrepancies herself even outside these presentations.

187. In planning for fiscal year 2025 during the budgeting cycle, FE3's team was telling the executives that the internal goals were unrealistic. That is, the brands were telling FE3 they were not realistic, and her team was relaying to the C-suite (including Defendants) that the goals were not realistic. For instance, it was well known internally that Curlsmith was never going to meet the targets for the brand set by management. To make up for such shortfalls, certain brands like OXO and PUR were expected to extend themselves even more to keep the high numbers management wanted across the board. According to FE3, the job was math, and the math was not mathing.

188. FE3 also revealed that there was a lack of willingness by the Company to base strategy decisions on tangible data. For instance, the Company was pouring money into projects like a new distribution center housed in Tennessee. FE3 described the process as similar to "The Money Pit," as leadership would constantly claim that the center would be ready within the next two quarters, but internally employees like FE3 knew that this was not possible. Difficulties in opening the new distribution center were common knowledge to employees, and FE3 also recalled speaking with Dunn about the project, who confirmed that no meaningful progress was being made up until 2024 when she left the Company.

189. Another prime example of the Company ignoring data was the Company's decision to close its office outside Los Angeles, California. FE3's team investigated the cost of trying to get out of its office leases early and realized they would not be able to do so and would have to pay approximately an entire year of rent on the building, thus making the idea financially imprudent. However, leadership ignored this and moved the brand to Boston, leaving only FE3 and one other employee in an empty office for nearly eight months.

190. That Defendants continued to issue overstated and overly optimistic financial metrics to investors that were contradicted by the Company's own internal data showing a much weaker financial reality further supports an inference of scienter.

191. These facts demonstrate that Defendants Geoffroy and Grass thus possessed information directly contradicting their public statements that Helen of Troy was successfully reinvesting Project Pegasus savings into the Company's top brands to execute the Company's long-term growth strategy.

### D. Defendants Knew That Analysts Focused on Their Public Statements

192. Defendants knew that analysts were particularly focused on Helen of Troy's ability to invest and grow its top brands, and that analysts credited Defendants' statements about the progress of reinvestment and growth initiatives.

193. For example, when Defendants first rolled out their Elevate for Growth reinvestment strategy on October 17, 2023, analysts at D.A. Davidson discussed Elevate for Growth and felt "optimistic about HELE's future," noting that "Project Pegasus greatly improves HELE's operating efficiency and provides 'fuel' to be invested to drive growth." Similarly, Raymond James analysts concluded that one of the "key drivers of growth" for the Company would be "improved growth in its 'Invest to Grow' portfolio," leading them to maintain their Market Perform rating of the Company's stock. This continued throughout the class period. For

instance, on October 9, 2024, Canaccord Genuity analysts raised their price target to $92 from $84, attributing in part the quarter's results to "improving marketing and innovation." And in its October 10, 2024 report giving Helen of Troy a "Buy" rating, Baptista Research explicitly pointed to the way the Company was "prioritiz[ing]" "[i]nvestment in marketing and innovation."

194. As the Class Period progressed, analysts continuously connected their ratings of Helen of Troy stock to its purported reinvestment strategy. For instance, on January 8, 2024, Canaccord Genuity analysts reiterated their "Buy" rating and $143 price target, stating: "We believe HELE is on the right track to not only execute its Project Pegasus efficiency plan to improve EBIT by $75M-$85M annually by FY26, but also their Elevate for Growth plan unveiled during their October investor day."

195. A day after the Company's Q4 fiscal year 2024 earnings call on April 24, 2024, Canaccord Genuity reiterated its "Buy" rating based on its impression that "[m]anagement was confident in their FY25 guide for sales and earnings along with the expectation for sales to inflect positively in 2Q through 4Q as they expect marketing and brand investment, innovation, shelf space gains, to help drive a return to sales growth."

196. On July 9, 2024, Canaccord Genuity maintained its "Buy" rating, highlighting in the title of their report after the earnings call that the Company's "refocus on brand building" would be "positive longer term." And on October 9, 2024, even after Defendants reported a decline in net sales of 3.5%, analysts at Canaccord Genuity maintained their positive rating, as Defendants claimed that its savings and reinvestment plan was "on track."

197. Analysts continued to credit Defendants' statements about their reinvestment progress into 2025. For instance, on January 14, 2025, Canaccord Genuity reported that "Project Pegasus is on track for ~$30M in savings in FY25, helping management reallocate savings into

brand marketing and innovation investment," and that "management was upbeat at the conference as we are starting to see recent investments in home & outdoor brands start to bear fruit, and management is making investments in beauty brands for 2025."

198. Knowing that analysts and investors were intensely focused on Helen of Troy's execution of its vital investment, innovation, and growth strategy, and given how closely analysts tracked Defendants' public statements about that strategy, it was at minimum severely reckless for Defendants to make unequivocal statements suggesting that Helen of Troy was "on track" to execute the strategy and was investing heavily in the Invest to Grow brands, when the Company was not.

### E. Defendants Knew the Events Underlying the Fraud Were Critical for Helen of Troy

199. Defendants knew that their reinvestment and growth plan was critical to Helen of Troy's turnaround, and they were motivated to lie to maintain artificial inflation in Helen of Troy's stock price. Prior to the Class Period, the market was watching Helen of Troy closely to see if it could recover after successive disappointing financial quarters and was particularly focused on the Company's ability to enhance and innovate its brands' product portfolios to grow in an otherwise challenging macro-environment. For example, an April 17, 2023 UBS analyst report discussed the likelihood of the Company seeing "an inflection in top- and bottom-line growth" after "earnings contraction over the last 18 months." The report noted that "the key debate for Helen of Troy . . . is ***when/if*** the company can return to organic revenue growth." UBS further opined that a potential path to recovery for the Company would hinge, in part, on "stronger share performance ***as [a] result of brand building/innovation***." Similarly, Oppenheimer noted in an April 19, 2023 report that the analyst was "closely watching competitive dynamics in this higher margin category for

HELE [water bottles] and ***management's innovation pipeline*** for the Hydro Flask brand to address recent consumer dynamics."

200. The Company's financial wellbeing thus hinged on the Company's ability to efficiently grow its critical brands.

201. Defendants responded directly to the market's concerns on October 17, 2023, the first day of the Class Period, when they detailed the comprehensive revitalization plan headlined by Project Pegasus and Elevate for Growth. Given the competitive landscape and difficult macroeconomic headwinds, the Company's ability to reinvest savings generated from Project Pegasus into its brands and to innovate its marketing and product portfolio was critical to Helen of Troy's business. Indeed, the Company itself characterized its Elevate for Growth plan unveiled on October 17, 2023 as "an ***inflection point*** in fundamentals and operating results," and touted that the "growth strategy fueled by Pegasus is a ***game changer***."

202. Given their own characterizations of this plan as an "inflection point" and "game changer" for the Company, and the market's stated interest in the success of these initiatives, it would be illogical to suggest that Defendants did not know, or at the very least were severely reckless in not knowing, about Helen of Troy's failure to follow through on this plan to reinvest in its brands to stimulate innovation and growth.

203. Similarly, given that the Company only explicitly discussed Drybar, Hydro Flask, Curlsmith, and Osprey as being Invest to Grow brands, and thus the recipient of outsized reinvestment of Project Pegasus savings, it would be illogical to suggest that Defendants did not know, or at the very least were severely reckless in not knowing, that these brands in particular received no reinvestment funds, were not innovating, and were failing to maintain beneficial relationships with key retailers. The fact that the savings and reinvestment initiatives, and the

Invest to Grow brands, were a core operation of Helen of Troy and were crucial to the Company's revenue, growth, and stock price—and that Defendants touted their importance and the Company's focus on it—supports a strong inference of Defendants' scienter with respect to their misleading statements on the subject.

### F. Defendants Were Motivated to Prop up Helen of Troy's Stock Price to Avoid Large Impairments

204. Immediately before and during the Class Period, the market was sharply focused on Helen of Troy's market capitalization (the total dollar value of a company's outstanding shares of stock). Helen of Troy managed brands that it acquired for many hundreds of millions of dollars, and its market capitalization had fallen to approximately $2.5 billion at the beginning of the Class Period, with its stock price trading at or around $100 per share. The market was also focused on Helen of Troy's sales guidance, which incorporated, at least in part, the Company's ability to succeed in its reinvestment and growth initiatives. As recounted above, analysts evaluated the Company's guidance in modeling the Company's expected share price.

205. Thus, if the stock price degradation of the Company continued, Helen of Troy would be at risk of having to write down its assets as their market value (being tied to the Company's share performance) dropped below their book value (what the Company spent on such brands during periods of peak demand).

206. Defendants were thus motivated to, and did, embark on a campaign to mislead investors and maintain artificial inflation in Helen of Troy's share price. And this gambit worked, for a time: indeed, despite several quarters of abysmal results, the Company was still priced at 0.9 times book value as of July 10, 2024, at a stock price approximately ***3 times higher*** than what it would ultimately fall to by the end of the Class Period once the truth was fully revealed. Because Helen of Troy's stock price was artificially inflated throughout the Class Period, that inflation only

being removed slowly over the course of several disclosures, the Company was able to avoid taking the impairments it was ultimately forced to take at the end of the Class Period many months after the Company would have been required to do so had the stock not been artificially inflated during the Class Period.

207. Knowing that the ever-narrowing gap between the Company's market capitalization and the book value of its brand assets could have serious accounting consequences, Defendants were motivated to defraud investors to maintain an artificially inflated stock price to avoid catastrophic impairment charges, which would only exacerbate the investing public's already shaken faith in the Company's growth prospects. That Defendants were motivated to mislead investors to maintain artificial inflation further supports the inference of scienter.

### G. Defendants Were Personally Motivated By Performance-Based Compensation Tied to the Metrics Inflated By the Fraud

208. Defendants Geoffroy and Grass also had concrete, personal financial motives to inflate the price of Helen of Troy common stock. During the Class Period, each participated in the Company's long-term incentive program under the Helen of Troy Limited 2018 Stock Incentive Plan, which awarded Performance Restricted Stock Awards ("Performance RSAs") at the beginning of each fiscal year (i.e., in March 2023, when fiscal year 2024 began) that vest only at the end of a three-year performance period. For example, the Performance RSAs granted for fiscal year 2024 vested in February 2026 if performance targets were met. The fiscal year 2025 and 2026 grants worked similarly. Fifty percent of each award depended on Helen of Troy's relative total shareholder return ("RTSR") against the Company's Compensation Peer Group—essentially, the

performance of the Company's stock relative to peer companies.[7] The other fifty percent depended on cumulative adjusted diluted EPS.

209. As of October 16, 2023, the day before the start of the Class Period, Helen of Troy's stock price had fallen -3.36% since the beginning of the three-year performance period: from $112.69 on February 28, 2023 to $108.90 on October 16, 2023. Based on an analysis of the peer group's stock price performance over the same period, that put Helen of Troy at approximately the 69th percentile of the peer group in RTSR. If Helen of Troy were to finish the performance period in the top quartile of the peer group in RTSR, which would only have required beating out ***one or two*** more of its peer companies for the performance period as of October 16, 2023, then Defendants Geoffroy and Grass would be paid out ***200% of the fiscal year 2024 target Performance RSAs***, amounting to 10,825 Performance RSAs for Defendant Geoffroy (worth ***$1.2 million***) and 3,222 for Defendant Grass (worth ***$351,000***).

210. These large Performance RSA awards motivated Defendants Geoffroy and Grass to defraud investors to artificially inflate, or maintain existing artificial inflation in, Helen of Troy's stock price.

---

[7] Per Helen of Troy's Fiscal Year 2024 proxy, the Company's listed peer group consisted of The Clorox Company; Church & Dwight Co., Inc.; Coty Inc.; Edgewell Personal Care Company; Energizer Holdings, Inc.; La-Z-Boy Incorporated; Newell Brands Inc.; Nu Skin Enterprises, Inc.; Prestige Consumer Healthcare Inc.; Spectrum Brands Holdings, Inc.; Tempur Sealy International, Inc.; Tupperware Brands Corporation; and YETI Holdings, Inc.

Defendants Geoffroy and Grass received even larger Performance RSA awards for fiscal years 2025 and 2026—if Helen of Troy met the maximum RTSR and EPS goals for both of those performance periods, Geoffroy and Grass stood to receive up to ***$13.8 million*** and ***$6.39 million***, respectively in Performance RSAs.

### H. Geoffroy Personally Caused a Shift Towards Cost-Cutting and Away From Brand Fundamentals and Product Innovation

211. Throughout the Class Period, Defendant Geoffroy personally promoted a culture of unrealistic expectations and ignored fundamental issues facing the Company's brands, even as employees raised concerns about the Company's declining performance and inability to compete. Former employees repeatedly identified Geoffroy as the source of the Company's degradation during the Class Period.

212. For example, FE3, the former Senior Finance Manager, explained that the push by leadership for unrealistic goals occurred every budget cycle post-2022, and that 2022 was probably the last year where the budget was close to what was proposed by the brand owners. FE3 recalled that she was "flabbergasted" by the disconnect of Geoffroy and the team she brought in and their disregard for realistic data.

213. FE7 recalled that when Geoffroy took over as CEO, the business started going downhill. In addition, FE2 identified that inflection point when the line from the executive level to "do more with less" occurred when Geoffroy took over.

214. That former employees consistently identify Defendant Noel Geoffroy as the source of the disconnect between the Company's investor-facing statements on reinvestment and innovation and the reality behind the scenes of budget cuts and unsupported projections further supports the scienter inference.

### I. The Timing of Executive Departures Further Supports Scienter

215. The timing and circumstances surrounding the unexpected departure of Defendant Geoffroy, shortly after significant revelations of Defendants' alleged fraud, further support an inference of scienter. On May 2, 2025, just one week after Defendants announced that the Company was taking a more than $50 million impairment charge on one of its flagship brands,

Drybar, after yet another dismal earnings report, the Company announced the unexpected departure of its CEO, Defendant Geoffroy, effective immediately. Geoffroy had been the Company's CEO for less than two years and was the figurehead of the Company's supposed revitalization plan. Geoffroy took credit for being the brainchild of Project Pegasus and Elevate for Growth—i.e., the plan for the Company to create operational efficiency savings through restructuring and to then reinvest those savings into its brands to stimulate innovation and growth. Even on her final investor call just a few days before Geoffroy was ousted, she continued to tout the progress and success of these initiatives just as she had throughout the Class Period.

216. Analysts and industry publications connected the departure of Defendant Geoffroy to the significant issues facing the Company, and in turn the more than 10% drop in Helen of Troy's stock price following the announcement. For example, *The Motley Fool* observed that "[w]hile some CEO departure announcements are greeted with an appreciation in a struggling stock on hopes of a turnaround, apparently, the market took Helen of Troy's announcement as a sign things may be worse under the surface." In the same article, *The Motley Fool* noted that "the sudden nature of the decision and lack of preparation for a replacement understandably has investors on edge."

217. That Defendant Geoffroy was suddenly ousted from Helen of Troy shortly after the Company began revealing the dire state of its allegedly poised-for-growth brands, which in turn revealed relevant truths concealed by Defendants' false and misleading statements, further supports a strong inference of scienter.

### J. Admissions From Grass and New CEO Uzzell Further Support an Inference of Scienter

218. After Defendant Geoffroy was ousted, Company executives admitted that the Company simply had not done the things Defendants promised investors it was doing during the

Class Period. These admissions stand in stark contrast to the repeated misrepresentations Defendants made during the Class Period. Specifically, on the Company's July 10, 2025 earnings call, Defendant Grass—then serving as interim CEO following Geoffroy's sudden departure—acknowledged that the Company had lost sight of fundamentals, stating, "What also became clear is that to win in today's environment, we must get back to fundamentals and move with greater speed. Candidly, we lost some of that along the way." Grass further admitted that the Company had become too sprawled and complicated, explaining, "It became too matrixed, too slow, and at times, disconnected from each other and the marketplace. We made our company too complicated and lost focus on what made our businesses great. I own that as a leader. Now, time to simplify, refocus, and accelerate."

219. Of course, Defendants during the Class Period had assured investors that they were actively focusing on the fundamentals, and prioritizing reinvestment in brands that promised the highest ROI while cutting costs at more stagnant brands. Further, Grass's statement acknowledges that he took part in the events that caused the issues that plagued the business, and that he "own[ed]" what happened, thus showing that he was aware of the issues that were the subject of the alleged misstatements.

220. On the Company's October 9, 2025 earnings call, newly appointed CEO G. Scott Uzzell similarly acknowledged the Company's failure to deliver on its promises, stating that the Company needed a "renewal," explaining, "I'm clear-eyed about the challenges we're facing. I embrace the opportunity to reverse course. Occasionally, companies need to go through a renewal, and at Helen of Troy, that renewal has started." Uzzell further acknowledged that organizational complexity had "handcuffed" the Company, stating, "We will reduce organizational complexity and bureaucracy that has handcuffed this organization. It takes too long to make decisions." Uzzell

promised to "simplify our business" and explained that the Company would "empower nimble and more concentrated teams to act quicker and make decisions closer to the consumer and the marketplace" and be "laser-focused on executing fewer, more impactful initiatives with excellence." This was a stark admission that the Company had not undertaken the renewal Defendants had promised during the Class Period with the supposedly game-changing Project Pegasus and Elevate for Growth initiatives.

221. Tellingly, in a virtual meeting hosted by Oppenheimer with Uzzell, Defendant Grass, and other upper executives that same day, management reported to analysts that the Company had "brands that need more focus and attention from better leveraging consumer insights and driving innovation," and that this was a "key area of focus" for the Company going forward, revealing that Defendants' previous representations of utilizing consumer insights and innovation had not in fact been occurring during the Class Period.

222. That Defendant Grass and new CEO Uzzell candidly admitted at the very end of the Class Period that the Company was not, in fact, focused on brand-building fundamentals or prioritization of the strongest brands further supports the scienter inference.

## VII. THE RELEVANT TRUTH EMERGES: ALLEGATIONS OF LOSS CAUSATION

223. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, Helen of Troy's stock price was artificially inflated because of Defendants' materially false and misleading statements that created false impressions concerning the status and purported success of Helen of Troy's reinvestment of Project Pegasus savings back into its brands, as well as its public revenue guidance. As a result of Defendants' materially false and misleading statements and omissions, the market price of Helen of Troy's common stock was artificially inflated throughout the Class Period.

224. The relevant facts of Defendants' fraudulent scheme were revealed to investors over a series of corrective events, each of which caused a significant stock price decline and investor losses. Each of these events disclosed some of the relevant truth in piecemeal fashion.

225. ***First***, on April 24, 2024, Helen of Troy announced that the Company was significantly delaying its Project Pegasus savings and reinvestment timeline and missed consensus guidance estimates. Specifically, the Company disclosed that it was pushing Project Pegasus savings out an additional year, meaning the savings that were originally scheduled to be realized in fiscal year 2026 (beginning in March 2025) would not be fully realized until fiscal 2027 (beginning in March 2026). That also meant that after having guided 50% of the total savings to come in fiscal year 2025 (which began in March 2024), the Company then only expected 35% of those savings that year. And the Company revealed that EPS guidance for fiscal year 2025 was $8.70-$9.20, significantly below consensus EPS guidance of $9.71. EBITDA also missed by a similar percentage: the Company gave a range of $324-$331 million compared with the consensus estimate of $354.5 million.

226. These disclosures partially revealed the truth previously concealed from investors in that Defendants disclosed that there would be less savings "fuel" generated by Project Pegasus over the next year to "reinvest" into the Company's brands, and that the "value creation flywheel" Defendants promised as a part of their recovery initiatives had not yet created value in the form of significant growth.

227. On this news, the price of Helen of Troy's common stock declined by $9.57 per share, or approximately 10% from a closing price of $100.28 per share on April 23, 2024, to a closing price of $90.71 per share on April 24, 2024.

228. As described in detail in ¶ 62, analysts attributed the drop in Helen of Troy's stock price to its announcement regarding the Company's slow realization of savings, and to the significant guidance miss. Analysts such as those from Raymond James also noted that issues including Helen of Troy's "slower realization of savings . . . limit[ed] visibility into the recovery acceleration embedded in management's FY targets."

229. Nevertheless, Defendants' continued misstatements that accompanied this disclosure, ¶¶ 140-44, maintained significant artificial inflation in Helen of Troy's stock price.

230. ***Second***, on July 9, 2024, Helen of Troy announced a nearly 50% decrease in year-over-year earnings for the first quarter of fiscal year 2025 and a dramatic miss against Company guidance issued just months before. Specifically, the Company revealed that EPS fell to just $0.99—a 49% drop—and lowered its outlook for adjusted EPS to $7.00 to $7.50, a 15%-20% decline from the $8.70 to $9.20 range it had provided in the previous quarter. Organic net sales of $416.8 million also fell 12%—***twice*** the midpoint of the decline range the Company had guided to in the previous quarter of 5%-7% and badly missing the analyst estimate of $445.8 million.

231. Defendants also revealed delays in the Iron Giant distribution facility startup. Specifically, Geoffroy revealed that the Company had "encountered some near-term disruption" with the facility which "created some unexpected challenges affecting our fulfillment of small retail customer and direct-to-consumer orders for OXO and Hydro Flask," resulting in "lost revenue, delayed productivity savings and additional costs." Geoffroy also admitted that "[t]he resulting shipping backlog was a factor that drove our net sales miss in the quarter."

232. As Defendant Geoffroy explained in a quote from Helen of Troy's press release published that day, these guidance misses and earnings disappointment caused the Company to

lower its annual outlook, "***which delays the delivery of the long-term financial algorithm in our strategic plan***."

233. These disclosures partially revealed the truth previously concealed from investors in that Defendants disclosed that Helen of Troy was far from creating the value promised from the Company's reinvestments into key brands to drive growth and that there were significant issues and disruptions with the Iron Giant Facility that impacted sales misses. And because Defendant Grass attributed the dramatic sales miss, in part, to a "fairly sudden and abrupt adjustment in order patterns with two key retailers," investors began to learn that Helen of Troy was not successfully strengthening relationships with key retailers or investing the necessary marketing funds towards those retailers.

234. In response, the price of Helen of Troy's common stock declined by $24.68, or approximately 27.7%, from a closing price of $89.01 on July 8, 2024, to a closing price of $64.33 on July 9, 2024.

235. As described in detail in ¶ 74, analysts attributed the drop in Helen of Troy's stock price to large declines in sales well below expectations.

236. Nevertheless, Defendants' continued misstatements that accompanied this disclosure, ¶¶ 147-50, maintained significant artificial inflation in Helen of Troy's stock price.

237. ***Third***, on April 24, 2025, Defendants disclosed that Helen of Troy took an impairment charge of $51.5 million on Drybar, one of its flagship brands, as a result of Drybar "experienc[ing] a decline in net sales revenue due to lower consumer demand, increased competition, and net distribution declines." In its SEC filings, the Company explicitly acknowledged the link between the impairment and Defendants' Elevate for Growth strategy and internal forecast revisions, disclosing to investors that avoiding further impairments would require

"execution of our Elevate for Growth" initiative, and that the triggers for the quantitative testing that resulted in the impairment were primarily the sustained stock price decline "and a revision of the Company's forecasted financial performance at year-end."

238. The Company also reported even more declines in earnings per share (yet again missing consensus expectations of $2.33 vs. $2.39), an 8% decline in organic net sales, and the need to reduce expenses relating to marketing and innovation. The Company also declined to provide guidance for fiscal year 2026 and stated that it was "stepping back from the long-term algorithm that we laid out at our Investor Day in October 2023."

239. These disclosures partially revealed the truth previously concealed from investors in that Defendants disclosed that Helen of Troy had not reinvested in or grown Drybar consistent with what they told investors they had been doing as part of the Elevate for Growth initiative (including repeatedly stating that those efforts were "on track" and that the Company was meeting its savings and reinvestment benchmarks), and it was their failure to execute on that initiative that drove the impairment. It was further revealed to investors that the Company would not ultimately disproportionately resource brands to drive product or marketing innovation at all, because the Company had to instead ***reduce*** its marketing and innovation spending.

240. As a result, the price of Helen of Troy's common stock declined by $4.08 per share, or nearly 12% from a closing price of $34.12 on April 23, 2025, to a closing price of $30.04 on April 24, 2025.

241. As discussed in ¶ 91, analysts attributed the drop to the Company's disclosure of its impairment and its reported decline in sales.

242. Nevertheless, Defendants' continued misstatements that accompanied this disclosure, ¶¶ 167-68, maintained significant artificial inflation in Helen of Troy's stock price.

243. ***Fourth***, on July 10, 2025, Helen of Troy announced yet another disastrous quarter, revealing that the Company experienced yet another double-digit sales decline (organic sales down 17% compared to analyst estimates of just a 9% decline) and a nearly 60% decline in adjusted EPS (missing analyst consensus estimates by more than 50%). The Company also announced that it had taken further impairment charges totaling $414.4 million on several of its purported Invest to Grow brands, including Hydro Flask, Drybar, Osprey, and Curlsmith, reflecting Helen of Troy having "reduced its forecasts for net sales revenue growth, gross margin and earnings before interest and taxes."

244. Defendant Grass admitted that the Company's dramatic sales and earnings decline was attributable to the Company having become "too matrixed, too slow, and at times, disconnected from each other and the marketplace. We made our company too complicated and lost focus on what made our businesses great. I own that as a leader. Now, time to simplify, refocus, and accelerate." The Company again declined to offer guidance for fiscal year 2026.

245. These disclosures partially revealed the truth previously concealed from investors in that Defendants disclosed that Helen of Troy had not reinvested in or grown the only brands the Company had identified as having received disproportionate reinvestment during the Class Period consistent with what they told investors they had been doing as part of the Elevate for Growth initiative, and it was their failure to execute on that initiative and meet their guidance that drove the impairment. These disclosures also revealed that, despite Defendants' misstatements to the contrary, the Company had not refocused on fundamentals, nor had it reinvested savings to effectively drive product or marketing innovation. The lack of reinvestment led to the loss of customer and retailer relationships and declining market share and sales. These issues eventually manifested into a severe decline in the value of the brands, necessitating an impairment.

246. Based on this news, the price of Helen of Troy's common stock declined by $7.04 per share, or nearly 22.7% from a closing price of $31.00 on July 9, 2025 to a closing price of $23.96 on July 10, 2025.

247. As discussed in ¶ 99, analysts attributed this to the Company's disclosure of its impairment and its reported decline in sales and also explicitly linked the massive impairment to the Company's failure to deliver on its Elevate for Growth promises. For example, on July 18, 2025, Behind the Numbers noted that the $414.4 million in impairments was in part "impacted by lower forecasted growth rates" and "weaker consumer and retailer demand."

248. ***Fifth***, on October 9, 2025, Helen of Troy revealed yet another quarter of disappointing earnings. The Company disclosed another net sales revenue decline, this time by 8.9%, driven by a decrease from organic business of 16%, which the Company attributed to "a decline in Beauty & Wellness" driven by lower sales of products including "hair appliances," "and a decline in Home & Outdoor resulting from a decrease in the insulated beverageware" (i.e., Hydro Flask) "and home categories." The Company's fiscal year EPS guidance of $3.75-$4.25 also missed consensus estimates by 13% at the mid-point, and its Q3 fiscal year 2026 EPS guidance similarly fell far below expectations.

249. The newly appointed CEO G. Scott Uzzell admitted to investors that the Company had "earned" its way "into a difficult period," and was only now embarking on the "renewal" Defendants represented had actually started in October of 2023 and was well underway throughout the Class Period.

250. Helen of Troy also revealed that its impairment charges had reached $740.8 million, still focused on its Invest to Grow brands, with Drybar, Curlsmith, Osprey and Hydro Flask all recording significant additional impairments. Once again, Helen of Troy's SEC filings revealed

that these new impairment charges were caused by the "further sustained decline in our stock price," and "downward revisions to our internal forecasts."

251. These disclosures finally revealed the full truth previously concealed from investors in that Defendants disclosed that Helen of Troy had not reinvested in or grown the only brands the Company had identified as having received disproportionate reinvestment during the Class Period consistent with what they told investors they had been doing as part of the Elevate for Growth initiative, and it was their failure to execute on that initiative and meet their guidance that drove the impairment. These disclosures also revealed that, despite Defendants' misstatements to the contrary, the Company had been slow to innovate and respond to increasing competition and had been dragged down by scattered and unfocused initiatives, none of which actually strengthened brand fundamentals or resulted in growth. These issues eventually manifested into a severe decline in the value of the brands, necessitating an impairment. Thus, only as of October 9, 2025 did the market learn of the full extent of Defendants' failure to execute on the Project Pegasus or Elevate for Growth initiatives.

252. In response to this news, the price of Helen of Troy's common stock declined by $6.90 per share, or 25% from a closing price of $27.61 on October 8, 2025 to a closing price of $20.71 on October 9, 2025.

253. As discussed in ¶ 105, analysts attributed this drop to the Company's disclosure of its impairment, its continued declining sales, and its comprehensive failure to execute on the initiatives Defendants had promised throughout the Class Period were underway and already creating value.

## VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

254. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading

statements pleaded in this Complaint. The misstatements complained of herein were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

255. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Section IV, *supra*), then-existing facts contradicted Defendants' statements regarding, among other things, Helen of Troy's progress towards the stated reinvestment in brands, the Company's supposed use and review of marketing analytics that supported Defendants' claims, the Company's relationships with key retailers at the time, and Defendants' efforts to and progress towards product and marketing innovation within the Company's brands. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability for their materially untrue and misleading statements.

256. Defendants Grass and Geoffroy also had actual knowledge that their statements to investors were false and misleading because they were divorced entirely from internal data and modeling regarding sales of Helen of Troy's brands. For example, FE3 explained that her boss repeatedly told Grass and Geoffroy that their sales projections were unrealistic and were not grounded in the Company's internal analytics. But Defendants did not revise their guidance or statements to investors when confronted with these facts.

257. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability for their materially untrue and misleading statements.

## IX. PRESUMPTION OF RELIANCE

258. The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Helen of Troy's common stock was efficient for the following reasons, among others:

(a) Helen of Troy's stock met the requirements for listing, and was listed and actively traded on the NASDAQ exchange, a highly efficient and automated market;

(b) Helen of Troy's common stock traded at high weekly volumes;

(c) As a regulated issuer, Helen of Troy filed periodic reports with the SEC;

(d) Helen of Troy was eligible to file registration statements with the SEC on Form S-3;

(e) Helen of Troy regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(f) Helen of Troy was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace;

(g) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Helen of Troy securities; and

(h) Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Helen of

Troy common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

259. As a result of the foregoing, the market for Helen of Troy's common stock reasonably promptly digested current information regarding Helen of Troy from all publicly available sources and reflected such information in the price of Helen of Troy's common stock. All purchasers of Helen of Troy common stock during the Class Period suffered similar injury through their purchase of Helen of Troy common stock at artificially inflated prices, and a presumption of reliance applies.

260. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X. CLASS ACTION ALLEGATIONS

261. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Helen of Troy common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

262. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Helen of Troy shares were actively traded on the NASDAQ Stock Market. As of September 30, 2025, Helen of Troy had approximately 23 million shares of common stock outstanding, owned by hundreds of thousands of investors. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be

ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the Class. Class members who purchased or acquired Helen of Troy common stock may be identified from records maintained by Helen of Troy or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

263. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

264. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Lead Plaintiffs have no interest that conflicts with the interests of the Class.

265. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether Defendants' material misrepresentations and omissions as alleged herein violated the federal securities laws;

(b) whether Defendants Geoffroy and Grass are personally liable for the alleged misrepresentations and omissions described herein;

(c) whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(d) whether the members of the Class have sustained damages, and the proper measure of damages.

266. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder (Against All Defendants)

267. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

268. This Count is asserted on behalf of all members of the Class against Helen of Troy and Defendants Geoffroy and Grass for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

269. During the Class Period, Defendants made, disseminated, or approved the false and misleading statements specified above, which they knew were, or they deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

270. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

271. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Helen of Troy's reinvestment (or lack thereof) into its brands; (b) artificially inflate and maintain the market price of Helen of Troy common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase Helen of Troy common stock at artificially inflated prices and suffer losses when the true facts became known.

272. Helen of Troy and Defendants Geoffroy and Grass are liable for all materially false and misleading statements they made during the Class Period, as alleged above.

273. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Helen of Troy stock, were either known to the Defendants or were so obvious that the Defendants were severely reckless in not knowing them.

274. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Helen of Troy common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased or acquired Helen of Troy common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' materially misleading statements.

275. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Helen of Troy common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act (Against Defendants Geoffroy and Grass)

276. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

277. This Count is asserted on behalf of all members of the Class against Defendants Geoffroy and Grass for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

278. Defendants Geoffroy and Grass acted as controlling persons of Helen of Troy within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

279. By reason of their high-level positions of control and authority as the Company's most senior officers, Defendants Geoffroy and Grass had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Defendants Geoffroy and Grass were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Helen of Troy during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

280. Defendants Geoffroy and Grass were provided with, or had unlimited access to, copies of the Company's public filings, earnings call scripts, and other statements alleged by Lead

Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

281. Each of Defendants Geoffroy and Grass spoke to investors on behalf of the Company during the Class Period, including at quarterly earnings calls and at industry and investor conferences. Therefore, each of Defendants Geoffroy and Grass was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Helen of Troy during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

282. As set forth above, Helen of Troy violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

283. By virtue of their positions as controlling persons of Helen of Troy and as a result of their own aforementioned conduct, Defendants Geoffroy and Grass are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Helen of Troy securities. As detailed above, during the respective times, Defendants Geoffroy and Grass served as officers and/or directors of Helen of Troy.

284. As a direct and proximate result of the conduct of Defendants Geoffroy and Grass, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Helen of Troy common stock.

## XI. PRAYER FOR RELIEF

285. **WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

(a) Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

(b) Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

(c) Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

(d) Awarding such other and further relief as this Court may deem just and proper.

## XII. JURY DEMAND

286. Lead Plaintiffs hereby demand a trial by jury.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Hannah Ross*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Hannah Ross
State Bar No. 402028
Scott R. Foglietta
State Bar No. 4888780
Robert Kravetz (*pro hac vice* pending)
Thomas Sperber (*pro hac vice* pending)
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
scott.foglietta@blbglaw.com
robert.kravetz@blbglaw.com
thomas.sperber@blbglaw.com

*Counsel for Lead Plaintiff City of Atlanta General Employees' Pension Plan, City of Atlanta Firefighters' Pension Plan, City of Atlanta Police Officers' Pension Plan*

*and Lead Counsel for the Proposed Class*

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar (*pro hac vice*)
Joseph A. Fonti (*pro hac vice* pending)
Evan A. Kubota (*pro hac vice* pending)
Thomas F. Allen (*pro hac vice* pending)
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1341
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ekubota@bfalaw.com
tallen@bfalaw.com

-and-

Ross Shikowitz (*pro hac vice*)
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
rshikowitz@bfalaw.com

*Counsel for Lead Plaintiff Metropolitan Transportation Authority Master Trust, and Manhattan and Bronx Surface Transit Operating Authority Pension Plan Trust and Lead Counsel for the Proposed Class*

**MARTIN & DROUGHT, P.C.**
Frank B. Burney
State Bar No. 03438100
Gerald T. Drought
State Bar No. 06134800
Federal Bar No. 8942
112 E. Pecan Street, Suite 1616
San Antonio, Texas 78205
Telephone: (210) 227-7591
Facsimile: (210) 227-7924
fburney@mdtlaw.com
gdrought@mdtlaw.com

*Liaison Counsel*